## JORDAN v. AMERICAN OIL CO.
### Civil Action No. 189.

District Court, D. Rhode Island.
Aug. 18, 1943.

William A. Gunning, of Providence, R. I., for plaintiff.

Arthur M. Allen and S. Everett Wilkins, Jr., both of Providence, R. I., for defendant.

HARTIGAN, District Judge.

This is an action brought by Frank Jordan of East Providence against The American Oil Company, a corporation duly organized under the law, with a regular place of and doing business in the City of Providence, to recover overtime compensation, and a like equal amount as liquidated damages, together with the costs of this action and a reasonable attorney's fee, under the provisions of Section 16(b) of the Fair Labor Standards Act of 1938. June 25, 1938, c. 676, 52 Stat. 1060, Title 29 U.S.C.A. § 201 et seq., hereinafter called The Act.

The defendant in its answer admits that it was engaged in the business of manufacturing, refining, selling, distributing, delivering, and transporting petroleum products in interstate commerce and that it owned a certain barge known as "MP 21", which it used for such purposes in carrying on such interstate commerce. The defendant also admits that said barge was not self-propelled and that the plaintiff was employed by the defendant on said barge in interstate commerce on monthly wages from March 3, 1939, to December 29, 1941, and that there were weeks during said period in which the plaintiff worked for the defendant more hours than were contained in the "hour work-week" referred to in paragraph V of the complaint, and that on such occasions the defendant did not compensate the plaintiff for employment in excess of such hours at rates not less than one and one-half times the plaintiff's regular compensation.

The defendant avers that the plaintiff was employed by the defendant on said barge as a seaman and that the provisions of Section 7 of the Fair Labor Standards Act are not applicable to seamen, and by virtue of such fact, the defendant has not violated and is not violating the provisions of any section of said Act and is not liable to the plaintiff thereunder.

In his complaint, the plaintiff alleges that he was employed by the defendant as a laborer on the defendant's barge MP 21.

The sole question for determination by the court is whether the plaintiff is a seaman within the meaning of The Act.

Sec. 13 (a) (3) of The Act provides an exemption from the minimum wage provisions of section 6 and the maximum hours provisions of section 7, as follows: "The provisions of sections 6 and 7 shall not apply with respect to * * * any employee employed as a seaman * * *."

In view of the admissions made by the defendant, it is not necessary to set out the evidence in detail except insofar as it applies to the character of the work performed by the plaintiff.

The parties have agreed that The American Oil Company was engaged in interstate commerce and the plaintiff was employed by the defendant in the course of carrying on interstate commerce during

78.

the period that is subject to this suit and the barges upon which the plaintiff was employed for such period were duly enrolled and licensed with the Bureau of Navigation of the Department of Commerce to the Mexican Petroleum Company.

From about the fall of 1937 to November 3, 1938, the plaintiff was employed as a relief man on barges at which time he was permanently assigned as a barge man at a monthly salary of $120. January 1, 1941, his salary was increased to $130 per month and on September 1, 1941, to $137. In addition, the plaintiff was allowed $1 for meals when the barge was away overnight from Providence. Prior to being assigned as a relief man on barges, the plaintiff worked for several years at the defendant's plant loading tank cars.

Plaintiff worked during said period on three barges, MP 21, MP 24, and MP 25, and he testified he always performed the same work.

These barges were of steel construction with a capacity of 7,000 barrels. They were not self-propelled, were always towed and had no steering apparatus. They were equipped with steam pumps, anchor, fog horn, lights, etc. The steam was obtained from shore and was used for the purpose of loading and unloading. The barges were equipped with a cabin which contained a stove, bunks and cooking utensils. They were licensed for bays, sounds, harbors, and rivers, between Cape Hatteras and Cape Cod. Their home port was New York. They carried enrollment and inspection certificates from the United States Department of Steamboat Inspection.

The plaintiff worked on these barges on the navigable waters of Narragansett Bay and Mount Hope Bay. They carried fuel oil between points located within the State of Rhode Island and from Providence, R. I. to Fall River, Mass., and Montaup, Mass.

The plaintiff gauged the barges before and after loading, and during the time of loading, which varied from four to eleven hours, the plaintiff was alone on the barge during which time he would watch the tanks and log the barge and its movements. After loading he would wait for a towboat which would come alongside and throw out three lines to plaintiff who would secure them to the barge. At night he switched on the running lights.

It was also the duty of the plaintiff to spot the barge in order to make a connection with the shore hose and the barge hose and with the assistance of a deck hand of the tugboat, get four lines ready to throw ashore. He would then swing the hose from the barge by means of a boom to the shore where a shore man would make a connection. Plaintiff would also make a steam hose connection in order to operate two pumps on the barge. The plaintiff oiled these pumps.

He pumped bilge water from the barge. When the barge was tied to the dock, loading or unloading, he ran up a pumping flag. It was also his duty to chip and paint the barges and watch when the barges were loading.

The plaintiff testified that he never had any regular hours but was relieved by a Manuel Pacheco, the captain of the barge, by arrangement made with him.

The plaintiff contended that when he got through in December 1941, his pay was 80¢ per hour for a forty-hour week. The credible testimony does not sustain his contention and I find that during the period he was assigned as a barge man, his salary was on a monthly basis although he was paid weekly.

Plaintiff's Ex. 5 shows that the plaintiff held a certificate of an able seaman from the United States Department of Commerce.

In cross-examination the plaintiff admitted that he and Manuel Pacheco decided between themselves who would go on in the morning and who would go on at night. He testified he never refused to do anything that the captain of the towboat told him to do.

John H. Cheetham, the defendant's superintendent, testified (Tr. pp. 123, 124):

"Q. What were Jordan's duties as a barge man? A. He was to act under the supervision of the captain, under the instructions of the captain. His duties would be whatever the captain assigned him to do, primarily for the safety of the boat, to stand awatch while she was under tow, light the lights at the proper time, load the barge in a proper manner and also discharge the cargo in a proper manner, and protect the safety of the boat at all times.

"Q. While the barge was under way, what particular duties were incumbent upon the barge man? A. He was to definitely watch the towboat, if he is on hawser, and observe the tow lines to see that she does not chafe on the bits and wear out or become weak. If that condition existed it was up to him to signal the towboat so

that they could put a new hawser on. It was also his duty to examine his boat spasmodically to see that she was developing no leaks, and would become in danger of sinking, and if so he was still to notify the tugboat. When the towboat happened to be towing the barge, it was his duty to watch the lines keeping her fast."

Manuel Pacheco, the master of the barges upon which the plaintiff worked, testified as follows (Tr. pp. 181, 182):

"Q. What were the duties of the men on the barge, Mr. Pacheco? A. The duties of the men on the barge—he had to load the barge, if it was to be loaded, or pump the barge out, if he had to pump the barge; stay on watch if he was on tow, and also stand a watch while he was doing the pumping or loading.

"Q. Did they have any duties with respect to the running lights? A. Yes, sir.

"Q. What were those duties? A. His duty was, when it comes time for the running lights to be on, to see that the lights were on.

"Q. Did they have any duties with respect to bilge water in the barge? A. Yes.

"Q. What were those? A. To keep the bilges dry.

"Q. How do you keep the bilges dry? A. By using the deck pump.

"Q. Did he have any duties with respect to the pumping flag? A. Yes.

"Q. What were those? A. What we call the discharging flag or the pumping flag, if we are loading, we have a flag up there, or if we are discharging.

"Q. I will ask you whether or not you instructed Mr. Jordan in the duties that you have just told us about? A. Right, I did.

"Q. When did you do that? A. When he first got hired as steady man on the barge."

In the case of Bolan v. Bay State Dredging & Contracting Co., D.C., 48 F.Supp. 266, Judge Ford discusses the range of variation in the use of the word "seaman". Reference is made to that case which was an action brought under The Act by the plaintiff who was employed as a deck-hand on one of the defendant's dredges.

■ An examination of the facts in the case of Gale v. Union Bag & Paper Corporation, 5 Cir., 116 F.2d 27, certiorari denied 313 U.S. 559, 61 S.Ct. 837, 85 L.Ed. 1519, discloses a striking likeness to the facts in the instant case. The court said at page 27 of 116 F.2d: "The word 'seaman' has a plain, ordinary meaning universally applied. Whether a person is a seaman depends upon the character of his duties. If they are maritime in character and rendered on a vessel in commerce, in navigable waters, he is a seaman. International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157." And at page 28 of 116 F.2d the court said: "It is immaterial that the vessels were without motive power. They were engaged in commerce upon navigable waters of the United States and were within the admiralty jurisdiction of the United States. It is apparent the barge men rendered services of a maritime character. They were necessary for the operation, welfare and safety of the barges. If the tow line had parted at any time on a voyage the barge would have been helpless and might have become a total loss if the barge tender was not there to drop the anchor and otherwise look out for its safety. The same is true if there was no one to pump out the bilge water as the barge might sink from its accumulation. The other duties they perform were also necessary and usual to the navigation of the barges. To restrict their employment to a week of 44 hours and ultimately to 40 hours per week would greatly interfere with the operation of such means of transportation. Probably barge tenders would not be employed at all. It is true that they might have worked longer hours by receiving pay for the overtime, at one and one-half times the prescribed rate, but that was their privilege and they could not have been compelled to perform services for longer hours unless they were willing. We consider that, both from the letter and the intention of the act, it is clear employees of this character, ordinarily to be considered seamen, were excepted from its provisions."

■ Applying the rule of law as laid down in the Gale case, supra, to the maritime character of the duties of the plaintiff performed on a vessel in commerce, in navigable waters, I find that the plaintiff is an employee employed as a seaman, and, therefore, is excluded under Sec. 13(a) (3) of the Fair Labor Standards Act of 1938 and is not entitled to recover anything in this suit.

Judgment may be entered for the defendant for costs.