EPIFANIO BERRÍOS, demandante, apelante y apelado, v. EASTERN SUGAR ASSOCIATES (*A Trust*) y su actual Presidente, MANUEL A. DEL VALLE, demandados, apelados y apelante la primera.

Número 11627.

*Sometido:* 17 de abril de 1956.  *Resuelto:* 15 de octubre de 1956.

*Vicente Géigel Polanco,* abogado del demandante, apelante y apelado; *Fiddler, González & Nido* y *Carlos J. Faure,* abogados de los demandados, apelados y apelante; *Hon. Secretario de Justicia José Trías Monge* y *Edgar S. Belaval, Procurador Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico, interventor.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del Tribunal.

Éste es un pleito en reclamación de salarios instado por Epifanio Berríos contra la Eastern Sugar Associates. Contestóse la querella, negando sus alegaciones esenciales y alegando ciertas defensas especiales. Fué el pleito a juicio. El mismo quedó sometido a base de una estipulación de hechos y de prueba testifical y documental aducida por una y otra parte. El tribunal a quo dictó sentencia declarando con lugar la querella y condenando a la querellada a pagar al querellante la suma total de $1,890.60, más las costas. En el curso de su opinión dicho tribunal concluyó, que la reclamación establecida por el obrero debía ser dividida en tres fases: primera, aquélla que comienza el 3 de junio de 1943 y termina el 25 de julio de 1947, cuando el querellante cesó en su trabajo de cocinero para la querellada; segunda, aquélla que comprende desde el 15 de agosto de 1947, hasta el 30 de marzo de 1949, durante la cual el querellante trabajó para la querellada como marino; y tercera, la comprendida entre el 30 de marzo de 1949, cuando el querellante reanudó su trabajo a base del contrato firmado en 21 de marzo de 1949, y el mes de junio de 1952; que en cuanto al primer período, o sea, del 3 de junio de 1943 al 25 de julio de 1947, fecha esta última en que el obrero cesó en su trabajo de cocinero y recibió la suma de $51.70 en un cheque como liquidación final del trabajo por él rendido hasta esa última fecha, la reclamación estaba prescrita al amparo de lo dispuesto por el art. 1867 del Código Civil, 31 L.P.R.A. sec. 5297; [1] que en relación con el segundo período, o sea, desde agosto 15 de 1947 hasta el 30 de marzo de 1949, entendía que éste debía percibir remuneración por las horas extras trabajadas durante el mismo de acuerdo con lo estipulado en el Decreto Mandatorio núm. 3; que dicho período ascendía a un año, siete meses, quince días, indicando las semanas que

[1] La querella fué radicada el 18 de agosto de 1952.

Berríos había trabajado en tiempo muerto y las que lo había hecho en época de zafra; que como cuestión de derecho determinaba que según dicho Decreto las horas extras trabajadas durante el tiempo de zafra en exceso de 48 a la semana debían ser satisfechas a tipo doble y las horas extras trabajadas durante el tiempo muerto en exceso de 40 a la semana debían pagarse a tiempo y medio; y que respecto al tercer período, o sea, el comprendido entre el 30 de marzo de 1949 y junio 25 de 1952, que es el período establecido a virtud del contrato suscrito por las partes el 21 de marzo de 1949, entendía que el contrato tenía las características de uno tipo Belo—*Walling* v. *Belo Corp.*, 316 U. S. 624, 86 L.Ed. 1716—indicando que no había "duda alguna de que la transportación de cañas de azúcar desde la Isla de Vieques al puerto de Humacao y viceversa, conlleva un número de incidencias que hacen completamente irregular dicho trabajo y está sujeta a que las cañas sean cortadas y puestas en el puerto de Vieques y estén listas en las barcazas para ser conducidas al puerto de Humacao; que las corrientes marítimas le sean favorables mientras son trasladadas a dicho puerto, pues si son desfavorables entonces la travesía se hace más pesada y se tarda mucho más en el traslado de las mismas y si todos estos factores no están debidamente acoplados, lo cual es muy difícil, el querellante se encuentra en la embarcación sin estar haciendo labor alguna." Ambas partes apelaron.

Discutiremos primeramente, y en el orden en que lo han sido, los errores señalados por el querellante.

## I

El tribunal inferior resolvió, como se ha visto, que la carta-contrato que el patrono dirigió al querellante el 21 de marzo de 1949 es un contrato del tipo Belo válido. El querellante sostiene que al así hacerlo dicho tribunal incidió. En esa carta, que figura en autos como *Exhibit* 3 de la querellada, ésta informa al querellante que a partir de esa fecha

(21 de marzo de 1949) su cargo sería el de marinero de embarcación marítima; que su tipo básico de retribución sería el de $0.40 por hora; que de utilizarse sus servicios, él dedicaría a su trabajo no menos de 63 horas semanales durante seis días a la semana; que todo tiempo trabajado en exceso de 48 horas semanales o de 8 horas diarias sería compensado a razón de dos veces el tipo básico de salario estipulado; que todo tiempo trabajado durante el día de descanso le sería igualmente compensado a razón de dos veces el tipo básico; y que su retribución durante cualquier semana en que trabajara nunca sería menor de $31.20.

En el caso de *Olazagasti* v. *Eastern Sugar Associates*, ante pág. 93, hicimos un resumen de la doctrina establecida por este Tribunal en el de *Peña* v. *Eastern Sugar Associates*, 75 D.P.R. 304, sobre los casos tipo Belo. Dijimos allí que "dicho contrato es uno, que de ser válido, le permite al patrono pagar un salario semanal uniforme que incluya paga extra por semanas en que la cantidad de trabajo realizado es diferente. Para ser válido debe cumplir con los siguientes requisitos: el tipo sencillo por hora establecido por el contrato debe ser igual o mayor que el fijado por la ley. Debe disponer el pago de tiempo y medio por horas trabajadas en exceso de 40 semanales. Debe fijar un salario semanal garantizado. Si el tipo por hora fijado en el contrato es tal que no determina razonablemente los salarios semanales que se intenta pagar, tanto para las horas sencillas como para las horas extras que se trabajan corrientemente, dicho tipo por hora resultará ficticio y nulo. La naturaleza del trabajo del empleado debe exigir horas irregulares de trabajo; y el número de horas que el empleado trabaje de hecho debe fluctuar de semana en semana. El contrato debe ser legal en todo sentido. Las pagas extras dispuestas en el mismo deben ser pagadas de hecho y esto debe hacerse prontamente. La validez del contrato se juzgará por el récord de trabajo del empleado y no meramente por los términos escuetos del contrato."

El tribunal sentenciador, conforme se ha indicado, decidió que dicho contrato era válido. No obstante, concluyó que "siendo el Decreto Mandatorio núm. 3 aplicable a este caso y el cual fija en .44¾ el jornal diario mínimo por hora a ser satisfecho al obrero según el inciso (g), establecido para la fase industrial de la industria azucarera, es el jornal mínimo de .44¾ la hora el aplicable y el querellante tiene derecho a ·que se le satisfagan las horas extras a base de dicho jornal . . .".

Es innecesario entrar a discutir las numerosas cuestiones que levanta el querellante en su alegato para demostrar la comisión del error imputado. Ya hemos dicho que en los casos de *Peña* v. *Eastern Sugar*, supra, y *Olazagasti* v. *Eastern Sugar*, supra, se resolvió que para que un contrato tipo Belo sea válido, el salario básico fijado en el contrato debe ser igual o mayor que el tipo mínimo legal. Como en el presente caso el tipo básico estipulado en el contrato lo fué el de 40 centavos por hora y el tipo mínimo legal según el Decreto Mandatorio núm. 3—aplicable a este caso—lo es 44¾ centavos por hora, ese requisito quedó incumplido.[2] Dicho requisito tiene su base, fundamentalmente, en la sec.

---

[2] El Decreto Mandatorio núm. 3, promulgado por la Junta de Salario Mínimo en 27 de febrero de 1943, para empezar a regir 60 días después de su promulgación dispone en su párrafo C-3(b):

"*Fase Industrial:* La transportación de la caña cuando sea hecha por centrales azucareras, el pesado, la preparación y molienda de la caña, y la elaboración, manipulación, empaque, pesado y almacenaje del azúcar y cualquier otra operación relacionada con el aspecto industrial de la manufactura de azúcar desde que la caña es pesada en la romana de la central hasta que el azúcar es removida de los almacenes de ésta; *Disponiéndose*, que *la transportación del azúcar, cuando sea hecha por las centrales, se considerará como parte de la fase industrial.*"

También dispone en su párrafo B(1) (Fase Industrial) que:

"Todo patrono que emplee trabajadores en la fase industrial de la industria del azúcar vendrá obligado a pagarle a los mismos, por lo menos, a razón de los siguientes tipos de salarios por hora para las distintas ocupaciones o trabajos detallados a continuación:

"(a) Toda clase de trabajo excepto los abajo clasificados.... ..33

".      .      .      .      .      .      .      .

"(g) Carpinteros, albañiles, herreros, torneros, soldadores, y *otros obreros de artes y oficios*— ,44¾." (Bastardillas nuestras.)

15 de la Ley núm. 8 de 5 de abril de 1941 (pág. 303), según fué enmendada por la Ley núm. 451 de 14 de mayo de 1947 (págs. 951, 965)—29 L.P.R.A. sec. 226—preceptiva de que "cualquier convenio colectivo, laudo u otro contrato de trabajo con obreros, en virtud del cual convenga un empleado en aceptar salarios menores a los fijados en el Decreto Mandatorio de la Junta de Salario Mínimo, será nulo." [3] Cf. *Sierra, Com.* v. *San Miguel*, 70 D.P.R. 604. A virtud de lo antes expuesto concluímos que el contrato anterior era uno tipo Belo frustrado, por ser contrario a la ley. En su consecuencia, la computación del tipo básico de paga por hora se hará dividiendo el salario semanal del obrero por el número de horas que constituyan la semana regular de trabajo. Véase *Peña* v. *Eastern Sugar*, supra. El resultado será el tipo sencillo por hora que deberá pagarse al querellante.

## II

El tribunal inferior también resolvió que en la fase industrial de la industria azucarera de Puerto Rico 48 horas constituyen una semana regular de trabajo durante el período de zafra y que las horas regulares trabajadas entre 40 y 48 horas a la semana no hay que pagarlas (durante dicho período) a razón de vez y media el tipo básico de salario. A este respecto el tribunal a quo manifestó que "como cuestión de derecho, de acuerdo con el Decreto Man-

---

[3] La sec. 25 de la Ley 8 de 1941 según fué enmendada por la Ley 451 de 1947 (págs. 951, 969) preceptúa además que: "todo obrero o empleado que por su trabajo reciba compensación distinta o inferior a la prescrita para cualquier industria, negocio u ocupación de acuerdo con esta ley o cualquier decreto, reglamento, resolución u orden de la Junta, tendrá derecho a cobrar mediante acción civil la diferencia adeudada hasta cubrir el importe total de la compensación que le corresponda más una cantidad igual a la que se le haya dejado de satisfacer, por concepto de penalidad adicional, además de las costas, gastos y honorarios de abogado del procedimiento, estos últimos en suma razonable que nunca bajará de cincuenta (50) dólares, sin que para nada de ello obste pacto en contrario." Véase *Caguas Bus Line* v. *Sierra, Com.*, 73 D.P.R. 743, 749.

datorio núm. 3, durante el tiempo de zafra en la fase industrial ningún patrono empleará a ningún obrero por más de 8 horas en cualquier período de 24 horas y constituyendo la semana de trabajo seis días laborables, ésta consta de 48 horas de trabajo, y durante el tiempo muerto, en la fase industrial la semana de trabajo la constituyen 40 horas de trabajo a la semana, . . .".

Es innegable que la industria azucarera, que es la industria a la cual se dedica la querellada, está cubierta por la Ley Federal de Normas Razonables de Trabajo. 29 U.S.C.A. secs. 201 y siguientes. Véase *Peña* v. *Eastern Sugar Associates*, supra. Esa ley en su sec. 213 de manera clara y taxativa dispone, sin embargo, en lo esencial que:

"(a) Las disposiciones de las secciones 206 y 207 de este título no serán aplicables a . . . (3) ningún obrero empleado *como marino;* . . ." (Bastardillas nuestras.) (⁴)

---

(⁴) Las secs. 206 y 207 de la Ley Federal de Normas Razonables de Trabajo, según fueron enmendadas, rezan en lo pertinente así:

"Sección 206.—Salarios Mínimos; Vigencia.—

"(a) .        .        .        .        .        .

"1. No menos de un dólar por hora.

"2. Si el empleado es persona que trabaja en su hogar en Puerto Rico o en las Islas Vírgenes, no menos del tipo mínimo por pieza prescrito por reglamento u orden; o de no existir tal mínimo por pieza, cualquier tipo por pieza adoptado por el patrono que conceda, a la proporción o clase de empleados prescrita por reglamento u orden, no menos del tipo de salario mínimo aplicable . . ."

"Sección 207—(a) Excepto en tanto en esta sección se disponga lo contrario, ningún patrono empleará a ninguno de sus empleados dedicado al comercio o a la producción de artículos para el comercio durante una semana de trabajo que exceda de 40 horas, a menos que tal empleado reciba compensación por su trabajo en exceso de las horas arriba especificadas a razón de no menos de vez y media el tipo regular de trabajo a que está empleado.

"        .        .        .        .        .        .

"(c) En el caso de un patrono dedicado a la elaboración primaria de leche, leche agria, suero, leche desnatada o crema en sus productos derivados . . . o en *la conversión* de remolacha, mieles de remolacha, *caña de azúcar* . . . *en azúcar* (aunque no en azúcar refinada) o en sirope las disposiciones del subinciso (a) de este título no serán aplicables a sus empleados no importa el sitio donde éstos se dediquen a tal cosa; . . ." (Bastardillas nuestras.)

Por otro lado, el art. 5 de la Ley 379 de 15 de mayo de 1948 (págs. 1255, 1259)—29 L.P.R.A. sec. 274—preceptúa que:

"Todo patrono que emplee o permita que trabaje un empleado durante horas extras vendrá obligado a pagarle por cada hora extra un tipo de salario igual al doble del tipo convenido para las horas regulares; *Disponiéndose, sin embargo,* que todo patrono de una industria de Puerto Rico cubierta por las disposiciones de la Ley de Normas Razonables de Trabajo (Fair Labor Standards Act), aprobada por el Congreso de Estados Unidos de América en 25 de junio de 1938, según ha sido o fuere subsiguientemente enmendada, sólo vendrá obligado a pagar por cada hora de trabajo en exceso de la jornada legal de ocho (8) horas o en exceso de cuarenta (40) horas a la semana un tipo de salario a razón de, por lo menos, tiempo y medio del tipo de salario convenido para las horas regulares, salvo el caso en que por decreto de la Junta de Salario Mínimo o convenio colectivo de trabajo se haya fijado o fijare otra norma de trabajo o de compensación, o de ambas. . . ."

Es necesario, en su consecuencia, resolver primeramente si Berríos es un marino y en caso afirmativo—como la Ley Federal de Normas Razonables no le cobija en ciertos aspectos—el alcance del Disponiéndose antes copiado del art. 5 de la Ley 379 de 1948.

El contrato celebrado entre Berríos y la querellada claramente dice que el cargo de éste será el de marinero. Como el nombre no hace la cosa—*Roosevelt, Gobernador* v. *Corte,* 42 D.P.R. 836, 838—es menester determinar cuál era la labor realizada por él durante el tercer período a que antes se ha aludido, para ver si puede ser conceptuado como "marino." Su propio testimonio a este respecto es al efecto de que trabajaba como marinero en una embarcación que tiraba de barcazas vacías de Punta Santiago (Playa de Humacao) a Vieques y luego las remolcaba cargadas de cañas de azúcar de Vieques a Punta Santiago, para ser molidas en la Cen-

tral Pasto Viejo, perteneciente a la querellada; y de que la embarcación en que trabajaba también tiraba de barcazas cargadas de azúcar desde el muelle en Punta Santiago hasta el vapor que la recibía, anclado en dicho puerto. ([5]) Conforme dijo la Corte de Apelaciones de los Estados Unidos para el Quinto Circuito en el caso de *Gale* v. *Union Bag & Paper Corp.*, 116 F.2d 27:

"La palabra 'marino' (*seaman*) tiene un significado sencillo y corriente, de aplicación universal. Si una persona es o no un marino depende de la naturaleza de sus deberes. Si éstos son de índole marítima y los servicios se rinden en una embarcación dedicada al comercio, por aguas navegables, esa persona es un marino," citando el caso de *International Stevedoring Co.* v. *Haverty*, 272 U. S. 50, 71 L.Ed. 157.

Véanse también, *Helena Glendale Ferry Co.* v. *Walling*, 132 F.2d 616, 619; *Gahagan Const. Corporation* v. *Armao*, 165 F.2d 301, 305; *Jordan* v. *American Oil Co.*, 51 F. Supp. 77, 79. *Cf. Carvalho* v. *Fregata*, 42 F.Supp. 404; *Anderson* v. *Manhattan Lighterage Corporation*, 148 F.2d 971. Bajo la definición anterior, no hay duda de que Berríos era un marino. En su consecuencia, a virtud de su propio contexto está excluído de las citadas disposiciones de la Ley Federal de Normas Razonables.

Esta exclusión, sin embargo, no tiene el efecto de relevar al peticionario de los efectos de la legislación local. Interpretando una cuestión similar a la aquí envuelta, dijimos en el caso de *Olazagasti* v. *Eastern Sugar Associates*, supra:

"El obrero querellante en el presente caso es un mecánico cuyos deberes comprendían reparar y mantener en condiciones de trabajo el molino de la referida central azucarera de la querellada . . . Como tal está incluído en la exención establecida por la sec. 7 (*c*) de la Ley de Normas Razonables de Tra-

---

([5]) En tiempo muerto también se dedicaba a reparar, calafatear y pintar las embarcaciones de la querellada, dedicadas a los anteriores menesteres.

bajo. 29 U.S.C.A. sec. 207(c). *Maneja et al.* v. *Waialua Agricultural Company,* 349 U. S. 254 . . .

". . . . . . . .

"Sin embargo, subsiste la cuestión de si nuestra Asamblea Legislativa al adoptar el art. 5 de la Ley 379 como cuestión de hecho dispuso el pago de horas extras a razón de tiempo y medio después de las cuarenta horas durante la época de zafra para aquellos empleados que, como el querellante, de lo contrario estarían exentos durante la época de zafra, a virtud de la sec. 7(c) de la Ley Federal, de las disposiciones sobre horas extras.

"Conforme indicamos en el escolio 10 que aparece a la pág. 322 del caso de Peña, una manera de convenir con la querellada es que intercalemos en el *Disponiéndose* del art. 5 las palabras 'cuando la Ley Federal requiera el pago de horas extras.' Esto significaría, desde luego, que no estaríamos siguiendo el lenguaje literal del estatuto. Mas si estamos convencidos de que no fué el propósito legislativo que ese contexto se leyera literalmente, nuestro deber es, doquiera que el contexto mismo se preste razonablemente a semejante interpretación, interpretarlo en armonía con la intención legislativa. *Borinquen Furniture, Inc.* v. *Tribunal, etc. y Umpierre,* 78 D.P.R. 901; *Colonos de Caña de Santa Juana, Inc.* v. *Junta Azucarera,* 77 D.P.R. 392.

"El *Disponiéndose* del art. 5 de la Ley 379 demuestra de su propia faz que la Asamblea Legislativa trataba de reenactar en nuestra ley local la fórmula federal sobre horas extras para paga semanal, en tanto en cuanto la ley local se aplicaba a industrias sujetas a la Ley Federal de Normas Razonables de Trabajo. Este criterio nuestro queda fortalecido por la disposición al efecto de que *sólo* se pagará tiempo y medio, mientras que a tenor de otros artículos de la ley las industrias locales deben pagar tiempo doble después que el obrero trabaja ocho horas por día. El uso de la palabra 'sólo' hace que parezca improbable que fuera la intención legislativa extender la responsabilidad del patrono más allá de lo dispuesto en la Ley Federal; sin embargo, ése sería el efecto de interpretar el *Disponiéndose* en el sentido de que excluye la exención sobre la época de zafra a que hace referencia la sec. 7(c) de la Ley Federal. En adición a ello, el historial legislativo de la Ley 379 demuestra que el *Disponiéndose* fué insertado en ella para 'atemperar' el estatuto local a la Ley Federal . . .

". . . . . . . . .

"En ese contexto la palabra 'atemperar' únicamente podía significar que el *Disponiéndose* del art. 5 de la Ley 379 preceptuaba sustancialmente la misma paga por horas extras durante la semana regular que la Ley Federal, incluyendo la exención durante la zafra contenida en el art. 7(c).

"Esta intención legislativa no fué cumplida a cabalidad. La fraseología de la sec. 7 y la última oración del art. 5 de nuestra ley exigen que se utilicen 40 horas como la semana regular de trabajo—más bien que las horas de hecho trabajadas, tal como lo dispone la Ley Federal—al calcular la paga por horas extras que debe recibir un obrero bajo un contrato Belo frustrado. Como resultado de esto el obrero recibe más paga por horas extras bajo la Ley 379 de la que recibiría bajo la Ley Federal. *Peña* v. *Eastern Sugar Associates,* supra. Es menester admitir que la disposición contenida en la Ley 379, relativa a un método más beneficioso para el obrero al calcularse la paga por horas extras bajo un contrato Belo frustrado que el que figura en la Ley Federal de Normas Razonables de Trabajo, debilita el argumento de que fué la intención legislativa en el *Disponiéndose* del art. 5 reiterar no sólo la fórmula federal de tiempo y medio después de 40 horas a la semana, sino también la exención federal del pago de tales horas extras en épocas de zafra contenida en el art. 7(c) de la Ley Federal. No obstante, creemos que puede aducirse un argumento bastante convincente —(1) del contexto del *Disponiéndose;* (2) del uso de la palabra *sólo;* y (3) de su historial legislativo—para la proposición de que el *Disponiéndose,* tomado aisladamente puede interpretarse como que conserva, más bien que en efecto elimina, la exención relativa a la paga por horas extras durante la época de zafra contenida en la Ley Federal, en tanto en cuanto concierne a la semana regular de trabajo. Empero, es innecesario que para llegar al resultado que aquí llegamos descansemos únicamente en el *Disponiéndose* del art. 5. El art. 22 de la Ley 379 dispone que 'quedarán subsistentes en todos sus términos' la Ley de Salario Mínimo y los Decretos Mandatorios que se hayan pomulgado a tenor de la misma. Al interpretar el art. 22 resolvimos que con una excepción, el mismo preserva las disposiciones de todos los decretos existentes, independientemente de si contienen disposiciones superiores o inferiores a las contenidas en la Ley núm. 379. *Caguas Bus Line* v. *Sierra,*

*Com.,* 73 D.P.R. 743. El párrafo B–2(*b*) del Decreto Mandatorio núm. 3 dispone que:

'Ningún patrono empleará a trabajador alguno en la fase industrial de la industria del azúcar durante el llamado "tiempo muerto" por más de cuarenta (40) horas en cualquier semana de trabajo, a menos que dicho trabajador reciba compensación por su trabajo en exceso de dichas cuarenta (40) horas a razón de tiempo y medio el tipo mínimo de salario aplicable de acuerdo con la escala establecida en el apartado B–1 de este Decreto.'

"Al aprobarse este Decreto en febrero de 1943, el art. 7(*c*) de la Ley Federal, conforme hemos visto, eximía ciertos empleados como el querellante de las disposiciones sobre paga por horas extras de la Ley Federal durante la época de zafra. Por tanto, es obvio que al limitarse la disposición sobre paga extra a tiempo y medio después de 40 horas en el párrafo B–2(*b*) al tiempo muerto, el Decreto Mandatorio núm. 3 en efecto adoptaba como cuestión de ley local la exención para épocas de cosechas contenida en la Ley Federal. Y cuando el art. 22 de la Ley 379 preservó todos los decretos existentes, la disposición implícita de una exención de paga por horas extras, basada en una semana de trabajo, durante la zafra—así como la disposición específica relativa al pago de tiempo y medio después de 40 horas de trabajo durante el tiempo muerto—continuaron en vigor a tenor de la regla restablecida en el caso de *Caguas Bus Line,* supra.

"Estamos conscientes de que el razonamiento anterior—al efecto de que la exención en época de zafra hallado implícitamente en el Decreto núm. 3 fué conservada por el artículo 22 de la Ley 379—sería más convincente si la exención se hubiera expuesto de manera específica más bien que implícitamente en el párrafo B–2(*b*). No obstante, creemos que cuando se agregue este razonamiento a la discusión que previamente hemos hecho de la intención legislativa al aprobar el *Disponiéndose* del art. 5, es correcta la conclusión de que al aprobarse la Ley núm. 379 no fué el propósito legislativo conceder a los obreros paga por horas extras que éstos no tenían derecho a recibir bajo la sec. 7(*c*) de la Ley Federal. . . ."

A virtud de lo anterior, concluímos que cuarenta horas constituían là semana regular de trabajo del querellante

durante el tercer período aquí envüelto; que durante el llamado "tiempo muerto" las horas trabajadas por él en exceso de cuarenta a la semana deben pagársele a razón de tiempo y medio y que durante el período de zafra las horas trabajadas en exceso de cuarenta deben serle pagadas a tipo sencillo. (6)   El segundo error señalado por el querellante fué, por tanto, cometido.

## III

■■ ¿Terminó el empleo del querellante en julio de 1947?   Si dicho empleo terminó el obrero tenía tres años a partir de esa fecha para ejercitar su acción por salarios adeudados hasta ese momento.   Art. 1867 del Código Ci-

---

(6) Lo dicho más arriba sólo es aplicable al tercer período—30 de marzo de 1949 a 25 de junio de 1952—cubierto por el contrato celebrado entre las partes, que hemos considerado como uno del tipo Belo frustrado. Al segundo período—15 de agosto de 1947 a 30 de marzo de 1949—le son aplicables el Decreto Mandatorio núm. 3 y la Ley 379 de 1948.   Durante el tiempo muerto cubierto por ese segundo período, la semana regular de trabajo de Berríos será calculada a base de cuarenta horas y las horas trabajadas en exceso de cuarenta le serán pagadas a razón de tiempo y medio el tipo mínimo.   Durante el período de zafra anterior a la vigencia de la Ley 379 de 1948, la semana regular de trabajo del obrero será calculada a base de cuarenta y ocho horas.   Véase el párrafo B–2(a) del Decreto Mandatorio núm. 3.

Nuestra decisión en el caso de *Ignacio López González* v. *Eastern Sugar Associates*, de fecha 2 de abril de 1956, (reconsideración denegada en 19 de junio del mismo año), en el cual se aplicó a un período anterior a la fecha de vigencia de la Ley 379 de 1948 la fórmula de dividir por cuarenta horas la compensación semanal durante la zafra para determinar el tipo regular y en el que se resolvió además que el reclamante tenía derecho a tiempo y medio por las horas trabajadas en exceso de cuarenta a la semana en tiempo de zafra, se basó en los contratos celebrados entre las partes.

De conformidad con otros preceptos legales, cualesquiera horas trabajadas por el querellante en exceso de cuarenta y ocho a la semana, de ocho horas diarias o durante el día de descanso deben serle pagadas a tipo doble.   Véanse el párrafo B–2(a) del Decreto Mandatorio núm. 3; Ley 379 de 1948; y Ley 289 de 1946.   *Cf.* Artículo II, Sección 16 de la Constitución del Estado Libre Asociado de Puerto Rico, Tomo 1, L.P.R.A. sec. 16, pág. 191.

vil.([7])   Si su empleo terminó, estaría prescrita la primera parte de la reclamación, ya que la querella fué instada en 18 de agosto de 1952.   Si no terminó el empleo, por haber habido meramente una interrupción en lo que se reorganizaba el servicio donde trabajaba el querellante, aún estaría viva su causa de acción en cuanto a ese período.

La prueba que tuvo ante sí el tribunal sentenciador fué contradictoria.   Quedó establecido que con anterioridad a julio de 1947 el querellante trabajó como cocinero en una barcaza.   Al volver a trabajar con la querellada lo hizo en calidad de marinero.   El 28 de julio de 1947 se le pagó mediante un cheque en que aparecen escritas las palabras "Final Liquidation 2—Weeks Salary" (Liquidación Final— Dos Semanas de Sueldo).   Sobre este particular el propio querellante declaró lo siguiente:

"R.—  . . .  En el 1947 estuve 2 ó 3 semanas y después de 2 ó 3 semanas en lo que reorganizaban y cogía otra vez la embarcación."

Sin embargo, luego dijo:

"P.—¿Cuando allá para el 28 de julio de 1947 que quedó usted cesante  . . .?
"R.—*Sí, señor, quedé cesante.*
"P.—*¿Quedó cesante?*
"R.—*Sí, señor.*
"
"P.—¿Pero sí recuerda que *quedó cesante?*
"R.—*Sí, señor.*

---

([7]) El art. 1867 del Código Civil, ed. 1930, 31 L.P.R.A. sec. 5297, dispone en lo esencial:

"Por el transcurso de tres años prescriben las acciones para el cumplimiento de las obligaciones siguientes:
"
"3. La de pagar a los menestrales, criados y jornaleros el importe de sus servicios, y de los suministros o desembolsos que hubiesen hecho, concernientes a los mismos.
"
"El tiempo para la prescripción de las acciones a que se refieren los tres párrafos anteriores se contará desde que dejaron de prestarse los respectivos servicios."

"P.—¿Estuvo cesante 2 ó 3 semanas o un mes?

"R.—Dos o tres semanas.

"         .         .         .         .         .         .

"P.—¿A ud. no lo despidieron, no lo dejaron cesante en esa ocasión?

"R.—*En esa ocasión, en el 1947 me dejaron cesante.*

"P.—*¿Lo dejaron cesante?*

"R.—*Sí, señor."* (Bastardillas nuestras.)

Fundándose en dicha prueba el tribunal sentenciador concluyó que como cuestión de hecho, el empleo del querellante cesó y que posteriormente volvió a trabajar en un nuevo empleo. En ausencia de error manifiesto—que no se cometió en este caso—no debe dejarse sin efecto esa conclusión. A base de esa doctrina y aplicando la sentada por nosotros en *Muñoz* v. *Corte*, 63 D.P.R. 236, y *Jiménez* v. *Corte*, 65 D.P.R. 36, (8) dicho tribunal resolvió correctamente que estaba prescrita la causa de acción del querellante respecto al período de tiempo anterior a julio de 1947.

## IV

El cuarto error señalado por el querellante ha podido ser discutido conjuntamente con el segundo, el cual como ya indicamos fué cometido. El tribunal inferior concluyó que el tipo básico de retribución era de $0.4475 la hora durante el período del 15 de agosto de 1947 al 20 de marzo de 1949 y durante el período del 21 de marzo de 1949 al 25 de junio de 1952. Se le imputa eso como error. Asimismo, que erró

---

(8) En el primero de esos casos resolvimos que:

"El término prescriptivo de tres años del artículo 1867 del Código Civil (ed. 1930) para los obreros reclamar a sus patronos el importe de sus servicios, empieza a correr desde que dichos obreros dejan de prestar los servicios respectivos y no a partir de la fecha en que el obrero recibe el pago de su salario."

Y en el segundo que:

"El obrero que abandone su trabajo por meses o años en una industria que funciona todo el año sin ofrecer una explicación para ello, cesa desde ese momento de rendirle servicios al patrono dentro del significado del artículo 1867 del Código Civil, a los efectos del término prescriptivo de cualquier reclamación por los que hasta ese momento prestara, aun cuando luego el mismo patrono lo vuelva a emplear."

al computar la compensación que el patrono dejó de pagar al querellante por concepto de horas extras durante el curso total del empleo. Este error fué cometido.

En *Peña* v. *Eastern Sugar Associates*, supra, dijimos a la pág. 321 que si bien "la regla federal es que cuando se invalida un contrato tipo Belo, el 'tipo sencillo' por hora se determina dividiendo el salario semanal por el número total de horas de hecho trabajadas durante esa semana específica. . . . el artículo 7 . . . de la Ley núm. 379 cambia esta regla, en beneficio del empleado, disponiendo que bajo estas circunstancias el divisor es el número de horas que constituyen la semana regular de trabajo."([9]) En armonía con lo así resuelto, para determinar la compensación adicional a que tiene derecho el querellante por las horas extras por él trabajadas, deberá dividirse el salario semanal estipulado en los contratos por el número de horas que constituyen la semana regular, tanto en tiempo muerto como en zafra.

## V

■■■ El tribunal inferior no condenó a los querellados al pago de honorarios de abogado. La contención del querellante es que debió hacerlo a tenor de lo dispuesto en el art. 13 de la Ley 379 de 1948, supra, 29 L.P.R.A. sec. 282. Este artículo dispone:

"Todo empleado que reciba una compensación menor que la fijada en las secs. 271 a 288 de este título para horas regulares y horas extras de trabajo, tendrá derecho a recobrar de su patrono mediante acción civil las cantidades no pagadas, más una suma igual por concepto de liquidación de daños y perjuicios, *además de las costas, gastos y honorarios de abogado del procedimiento.*" (Bastardillas nuestras.)

El contexto del art. 13, supra, es de claridad meridiana. Este Tribunal ha resuelto que la condena en daños líquidos

---

([9])El art. 7 de la Ley 379 de 1948, págs. 1255, 1261—29 L.P.R.A. sec. 276—dispone que "si el empleado trabaja por un salario semanal el salario estipulado cubrirá únicamente el pago de las horas regulares de trabajo durante cada semana."

es imperativa. *Tulier* v. *Autoridad de Tierras*, 70 D.P.R. 267; *Peña* v. *Eastern Sugar Associates*, supra. También lo es la imposición de honorarios de abogados en casos de esta naturaleza. Véanse, además, la sec. 25 de la Ley núm. 8 de 1941 (págs. 303, 325), según fué enmendada por la Ley núm. 451 de 1947 (págs. 951, 969), y el art. 2 de la Ley núm. 402 de 1950.[10]

La querellada ha sostenido en todo momento, tanto en el tribunal inferior como en los alegatos por ella radicados ante nos, que el precepto en cuestión es inconstitucional, toda vez que según el mismo si el obrero resulta victorioso es obligatorio para el tribunal imponerle el pago de honorarios de abogado a la parte querellada, mientras que por el contrario si la parte querellada resulta victoriosa ella no tiene derecho a que se le concedan honorarios de abogado.[11] En apoyo de su contención la querellada cita un buen número de casos que hemos leído cuidadosamente y que en nuestra opinión son

---

[10] La sec. 25 de la Ley núm. 8 de 1941 (págs. 303, 325), según fué enmendada por la Ley núm. 451 de 1947 (págs. 951, 969) reza así:

"Todo obrero o empleado que por su trabajo reciba compensación distinta o inferior a la prescrita para cualquier industria, negocio u ocupación de acuerdo con esta ley o cualquier decreto, reglamento, resolución u orden de la Junta, tendrá derecho a cobrar mediante acción civil la diferencia adeudada . . . además de las costas, gastos y honorarios de abogado del procedimiento, estos últimos en suma razonable que nunca bajará de $50 sin que para nada de ello obste pacto en contrario."
Y el art. 2 de la Ley 402 de 1950 (págs. 955, 957) dispone que:

"En todo caso radicado ante las cortes de Puerto Rico por un trabajador o empleado en que se reclame cualquier derecho o suma de dinero por servicios prestados a su patrono y en que se conceda la reclamación en todo o en parte, se condenará al patrono al pago de honorarios de abogado si éste no fuere uno de los abogados del Departamento del Trabajo."

[11] A tenor de lo dispuesto por la Ley 451 de 14 de mayo de 1952 (pág. 919), en primero de febrero de 1956 dictamos resolución concediendo al Secretario de Justicia un término de 30 días para que a nombre del Estado Libre Asociado de Puerto Rico intervenga como parte en el litigio. En respuesta a esa resolución nuestra, el Secretario de Justicia se ha personado en autos sosteniendo la validez de la disposición relativa a la condena al pago de honorarios a la parte querellada contenida en las leyes antes citadas.

distinguibles o no son de aplicación.($^{12}$)   No es menester que analicemos todos y cada uno de esos casos en el curso· de esta opinión.   La cuestión así suscitada ha sido ya resuelta por nosotros—*Feliciano* v. *P. R. Express Co.*, 67 D.P.R. 377—al igual que por el Tribunal Supremo de la nación.   En el caso de *Missouri, Kansas & Texas Ry.* v. *Cade*, 233 U. S. 642, 58 L.Ed. 1135 (1914), citado en el de *Feliciano*, supra, se instó demanda ante un juez de paz en reclamación de la suma de $10.75 por salarios adeudados, más $9 como honorarios de abogado.   Estos últimos se reclamaban a virtud de una ley aprobada por el Estado de Tejas el 13 de marzo de 1909.   La demandada se opuso especialmente a esta última parte de la reclamación, alegando para ello que la ley era nula por constituir una carga al comercio interestatal, ser contraria a la Cláusula de Comercio de la Constitución Federal y a la Ley para Regular el Comercio, según fué enmendada, y por violar las cláusulas sobre "igual protección y debido proceso de ley" de la Enmienda Décimocuarta de la Constitución Federal.   No obstante estas contenciones de la demandada, se dictó sentencia a favor del demandante por la suma reclamada, incluyendo los honorarios de abogado.   Según la práctica civil de aquel estado no se podía apelar de la decisión de un juez de paz para un tribunal de superior categoría en un caso que envolviera una cuantía inferior a $20.   El caso fué llevado al Tribunal Supremo de los Estados Unidos mediante recurso de error con el propósito de revisar las cuestiones federales envueltas. En el curso de su opinión el Tribunal Supremo de la nación se expresó así:

"Se insiste en que los beneficios de la ley sólo se conceden a personas naturales, pero ello es algo que no podemos admitir

---

($^{12}$) La querellada cita en apoyo de su contención los casos de *Chicago R. I. & P. Ry. Co.* v. *Mashore*, (1908), 21 Okla. 275, 96 Pac. 630; *Oligschlager* v. *Stephenson*, (1909), 24 Okla. 760, 104 Pac. 345; *Coal Company* v. *Rosser*, (1895), 53 Ohio 12, 41 N.E. 263; *Hunter* v. *Flowers*, (1949), 43 So.2d. 435; y *Gulf C. & S. F. Ry. Co.* v. *Ellis*, (1897), 165 U. S. 150, 41 L.Ed. 666.

en ausencia de una decisión de los tribunales de aquel estado dando al estatuto una interpretación tan limitada. (Cita.) Además la demandada no está en posición de atacar la legislación fundada en que corporaciones que sean demandantes no están cubiertas por esa ley. (Cita.)

"Si la clasificación es de otro modo razonable, el mero hecho de que se concedan honorarios de abogado tan sólo a demandantes victoriosos, mas no así a demandados victoriosos, no hace que el estatuto viole la cláusula 'sobre igual protección.' Esto no envuelve una discriminación entre ciudadanos o clases de ciudadanos, toda vez que los miembros de cualesquiera clases y de todas las clases pueden demandar o ser demandados. Demandantes y demandados difieren en sus respectivas actitudes en un litigio; a los primeros incumbe acudir a la jurisdicción apropiada y traer las partes ante ella, así como probar las cuestiones fundamentales envueltas en el litigio. Estas diferencias pueden servir de base a que se les trate de distinta manera respecto a la concesión de honorarios de abogado como parte de las costas. (Citas.)

"Aún si se considera que el estatuto impone una penalidad a litigantes perdidosos en los casos cubiertos por el mismo, tal penalidad se impone obviamente como un incentivo que induzca al pronto arreglo de reclamaciones que aunque pequeñas resultan bien fundadas, y como un freno a las defensas carentes de fundamento, tanto más opresivas cuanto más pequeñas sean las sumas reclamadas.

"Pero no creemos que sea correcto considerar el presente como un estatuto que impone una penalidad. La concesión de honorarios de abogado está limitada a una suma razonable, que no exceda de $20, cuando como cuestión de hecho se utiliza un abogado, debiendo ser la cuantía determinada por el tribunal o jurado que juzgue el caso. Evidentemente el fin del estatuto es meramente requerir que la parte demandada pague al demandante parte de los gastos que de otro modo no sean recobrables como 'costas del litigio.' El contexto del estatuto impone solamente daños compensatorios a un demandado que a juicio del legislador demora y se opone de manera irrazonable al pago de una justa reclamación. La erogación por concepto de honorarios de abogado es una consecuencia necesaria del litigio, y como una u otra parte tienen que afrontarla, resulta razonable imponerlos a la parte cuya negativa a avenirse a una justa reclamación da lugar a que surja el litigio. La concesión de las

costas ordinarias del litigio a la parte victoriosa se basa en el mismo principio. (Cita.) Numerosos casos de las cortes estatales han sostenido legislación de esa naturaleza. (Citas.) Si se puede imponer una penalidad razonable por dejarse de pagar una reclamación que el tribunal considera justa, se deduce *a fortiori* que las costas y honorarios de abogados pueden ser concedidos. (Citas.)

"Por los anteriores motivos, nos parece que el estatuto en cuestión no viola ni la cláusula de 'igual protección' ni la del 'debido procedimiento de ley' de la Enmienda Décimocuarta."

Ese mismo principio ya estaba latente en otros casos anteriores al de *Cade*, resuelto por el propio Tribunal Supremo Federal, según puede comprobarse examinando las opiniones emitidas en *Atchison, Topeka & Santa Fe Railroad Co.* v. *Matthews*, (1899), 174 U. S. 96; y *Fidelity Mutual Life Association* v. *Mettler* (1902), 185 U. S. 308. En igual sentido se pronuncia el caso de *Chicago, B & Q. R. Co. et al.* v. *Feintuch et al.* (1911), 191 Fed. 482. La doctrina del caso de *Cade*, supra, ha sido igualmente aplicada en otros casos posteriores. Véanse: *Missouri, Kansas & Texas Ry. Co.* v. *Harris*, (1914), 234 U. S. 412; *Meeker & Co.* v. *Lehigh Valley Railroad Co.* (1915), 236 U. S. 412; y *Dohany* v. *Rogers et al.*, (1930), 281 U. S. 362. Estamos enteramente de acuerdo con lo resuelto en el caso de *Missouri, Kansas & Texas Ry.* v. *Cade*, supra, y con los casos que a éste siguieron. Nuestra conclusión por tanto es que la disposición contenida en las tres leyes citadas es constitucional. Este error fué, en su consecuencia, cometido. Por disposición expresa de ley la querellada debió haber sido condenada al pago de honorarios de abogado. Estimamos que la suma de $1,500 por este concepto es razonable.

Disponemos así de la apelación interpuesta por el querellante y pasamos en seguida a discutir los errores señalados por la querellada.

## VI

El primero es al efecto de que "erró el tribunal inferior al resolver que Berríos tenía derecho a compensación bajo

las disposiciones del Decreto Mandatorio núm. 3, y en la forma de computar el tipo básico de salario bajo el mismo." Cuanto hemos dicho más arriba en relación con los errores segundo y cuarto señalados por el querellante es de aplicación aquí. Es innecesario repetir los razonamientos en ellos expuestos.

## VII

El segundo y último error imputado por la querellada es en el sentido de que "erró el tribunal inferior al no resolver que las reclamaciones de Berríos con posterioridad al 25 de julio de 1947 estaban prescritas bajo la Ley de Portal a Portal y/o bajo el artículo 1867, Código Civil de Puerto Rico."

La reclamación del querellante está basada en estatutos locales. De ello no hay la menor duda. La Ley de Portal a Portal no es, por tanto, de aplicación. El art. 1867 del Código Civil, ed. 1930—31 L.P.R.A. sec. 5297—dispone en lo esencial que por el transcurso de tres años prescriben las acciones para el cumplimiento de la obligación de pagar a los menestrales, criados y jornaleros el importe de sus servicios, así como que el tiempo para la prescripción de esa acción se contará desde que dejaron de prestarse los respectivos servicios. Como en este caso Berríos trabajó para la querellada hasta junio de 1952, y su querella fué radicada el 18 de agosto del mismo año, su causa de acción, en cuanto a los períodos segundo y tercero arriba mencionados, no había prescrito. Véanse *Jiménez* v. *Corte*, supra, y *Muñoz* v. *Corte*, supra, así como *Olazagasti* v. *Eastern Sugar Associates*, supra.

*La sentencia apelada será modificada de conformidad con los términos de esta opinión, y así modificada será confirmada.*

El Juez Asociado Sr. Sifre no intervino.