GASPAR RODRÍGUEZ MORALES y otros, querellantes y apelados, *v.* EASTERN SUGAR ASSOCIATES, hoy FAJARDO EASTERN SUGAR ASSOCIATES, querellada y apelante.

Número 12574.

*Sometido:* 9 de diciembre de 1959. *Resuelto:* 5 de mayo de 1961.

*Fiddler, González, Guillemard & Rodríguez* y *Eduardo Negrón Rodríguez,* abogados de la apelante; *Vicente Géigel Polanco* y *Vicente Géigel Lanuza,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Recientemente, en *Agostini et al.* v. *Tribunal Superior,* ante, pág. 219, resuelto en 7 de marzo de 1961, reexaminamos la doctrina relativa a la interrupción del término prescriptivo de tres años para instar las reclamaciones de salarios de un empleado contra su patrono, cuando el obrero está empleado en una industria, o explotación fabril o agrícola, que opera durante todo el año. Específicamente dijimos que, de acuerdo con el estado de nuestra jurisprudencia,[1] dicho término comienza a contarse cuando *a)* el obrero cesa de trabajar para su patrono; *b)* el obrero interrumpe sus

---

[1] *Muñoz* v. *Corte,* 63 D.P.R. 236 (1944); *Avellanet* v. *P. R. Express Co.,* 64 D.P.R. 693 (1945); *Jiménez* v. *Corte,* 65 D.P.R. 37 (1945); *Valiente y Cía.* v. *Corte,* 68 D.P.R. 529 (1948); *Chabrán* v. *Bull Insular Line,* 69 D.P.R. 269 (1948); *Vicenty* v. *Corona Brewing Corp.,* 73 D.P.R. 135 (1952); *Lebrón* v. *P. R. Ry., Lt. & P. Co.,* 78 D.P.R. 683, 695 (1955); *Berríos* v. *Eastern Sugar Associates,* 79 D.P.R. 688 (1956); *Sierra* v. *Mario Mercado e Hijos,* 81 D.P.R. 314 (1959).

servicios por un período de tiempo sin explicación para ello, aunque el patrono vuelva a emplearlo; y, *c*) se opera una novación del contrato por motivo de cambios sustanciales en la naturaleza de los servicios que venía prestando.[2]

██ En el presente recurso se plantea el programa de la prescripción de las acciones en reclamación de salarios instadas por obreros o empleados de una empresa estacional, o sea, que opera solamente durante determinado período del año. Debemos resolver si el empleado cesa en su empleo a la expiración de cada período anual de operaciones. Conviene aclarar que, como la querella en el presente caso se radicó en 13 de septiembre de 1957, cuando ya estaba en vigor la Ley Núm. 96 de 26 de junio de 1956 (Leyes, pág. 623, 29 L.P.R.A. secs. 245 a 246m), la prescripción de la acción de los querellantes se rige por esta nueva ley, y no por el artículo 1867 del Código Civil (31 L.P.R.A. sec. 5297). *Agostini et al.* v. *Tribunal Superior*, supra. Por tanto, el período prescriptivo de tres años comienza a contarse "desde que el empleado *cesó* en su empleo con el patrono" y no "desde que dejaron de prestarse los respectivos servicios".

Los seis querellantes prestaron servicios a la querellada Eastern Sugar Associates como empleados en la elaboración de azúcar y mieles en la industria del azúcar por un período que comprende los años 1948 a 1957. Desempeñaban sus labores durante el período de la zafra y trabajaban como pesadores de caña, capataz en un almacén de estibar azúcar y analista en el laboratorio del ingenio. Esta fase de la industria opera únicamente durante el período de zafra o molienda de cañas, y generalmente cubre los primeros meses del año. El resto del año se conoce como "tiempo muerto",

---

[2] Por disposición expresa de la sección 32(*d*) de la Ley Núm. 96 de 26 de junio de 1956 (Leyes, pág. 623, 29 L.P.R.A. sec. 246(*d*)) un cambio en la naturaleza de las labores del empleado no se considerará como una novación. Sin embargo, esta disposición no afecta los casos radicados en los tribunales en o antes del día 26 de junio de 1957. (Sección 32(*e*) de la Ley Núm. 96 de 1956, supra.)

y durante el mismo la actividad principal en la industria consiste en la siembra y cultivo de las cañas. Para los años 1948 a 1953 los querellantes prestaron sus servicios bajo "contratos" escritos;(3) desde 1954 en adelante el convenio entre las partes fue verbal. En el tiempo muerto, cuatro de los reclamantes trabajaron para otros patronos en una fábrica de tabacos, en una mueblería, supervisando obras y en la industria de la construcción; otro, se dedicó a un negocio propio de comercio; y el otro, descansó parte del tiempo y trabajó para la querellada en embarques de azúcar

---

(3) Los "contratos" a que se refieren las partes eran en forma de cartas en estarcido dirigidos por la querellada a los querellantes. Para los años 1948 a 1952, ambos inclusive, dichas cartas leían como sigue:

"Tenemos el gusto de ofrecer a usted una plaza de Pesador Caña con este fideicomiso para la zafra de 1947–48, bajo los siguientes términos y condiciones:

"Vendrá usted obligado a trabajar 8 horas en cada uno de los siete días de la semana, o sea un total de 56 horas.

"Sus servicios serán compensados a razón de $.42968 por hora regular de trabajo, y a razón de dos veces dicho tipo por aquellas horas en que usted venga obligado a trabajar, y trabaje, en exceso de 8 horas en cualquier día, y por aquellas horas en que se requieran sus servicios durante el día de descanso que marca la ley.

"En vista de lo anteriormente expuesto se le garantiza un salario semanal de $27.50 por un período de XXX semanas.

"Usted deberá incorporarse al trabajo todos los días de la zafra a menos que el patrono lo autorice en contrario.

"Usted deberá estar listo tan pronto así se le notifique para presentarse a la central o a aquella otra de sus centrales que el patrono disponga.

"Queda entendido que usted observará buena conducta y puntualidad durante su empleo y el patrono se reserva el derecho de dejar sin efecto este contrato en caso de que usted violase las normas de disciplina establecidas por el patrono.

"Mediante su aceptación del empleo que aquí le ofrecemos bajo los términos y condiciones mencionados, se considerará por ambas partes la presente carta como un contrato de empleo para la zafra de 1947–48."

En 1953 se enmendó la redacción en la forma siguiente:

"Confirmamos lo ya convenido con usted en relación con la plaza de Pesador de Caña que usted ocupa con este fideicomiso para la zafra de 1952–1953, y cuyos términos y condiciones son los siguientes:

"Vendrá usted obligado a trabajar 8 horas durante seis días a la semana, o sea un total de 48 horas semanales.

"Sus servicios serán compensados a razón de $0.88 por hora regular de trabajo, y a razón de dos veces dicho tipo por aquellas horas en que usted venga obligado a trabajar, y trabaje, en exceso de 8 horas en cual-

y obras de represar un río. El tribunal determinó además que los querellantes venían desempeñando las mismas labores para la querellada durante la zafra desde varios años antes de 1948 y que "tanto en el ánimo de la demandada como en el de los querellantes se consideró que a la terminación de cada zafra los demandantes trabajarían con la querellada y la querellada conservaría la oportunidad de empleo para con los querellantes".[4]   No hay controversia sustancial en cuanto a que los obreros demandantes prestaban servicios seis

---

quier día, y por aquellas horas en que se requieran sus servicios durante el día de descanso que marca la ley.

"En vista del carácter estacional de su trabajo, se garantiza que el Patrono requerirá y compensará sus servicios por un período no menor de—semanas durante la mencionada zafra.

"Queda entendido que usted observará buena conducta y puntualidad durante su empleo y el patrono se reserva el derecho de dejar sin efecto este contrato en caso de que usted violase las normas de disciplina establecidas por el patrono.

"Mediante su aceptación del referido empleo bajo los términos y condiciones mencionados, se considerará por ambas partes la presente carta como un contrato de empleo para la zafra de 1952–1953."
Observamos que en relación con las zafras de los años 1951, 1952 y 1953, los querellantes Gaspar Rodríguez Morales, Manuel Flores y Artemio Caraballo comenzaron a trabajar en enero 25 de 1951, febrero 8 de 1952 y febrero 23 de 1953; la aceptación de los términos de los "contratos" aparece fechada en enero 31 de 1951, marzo 17 de 1952 y abril 15 de 1953, o sea, después de haber comenzado a prestar servicios. En cuanto al querellante Rafael Atilano Colón, la prueba revela que en las zafras de 1950, 1951 y 1953 comenzó a trabajar en enero 30 de 1950, febrero 1 de 1951 y febrero 23 de 1953, y que la aceptación de los "contratos" tiene fecha de febrero 7 de 1950, abril 2 de 1951 y marzo 10 de 1953. Esto demuestra palmariamente que el "contrato" era una mera formalidad que no tenía evidentemente otro propósito que dejar consignados por escrito los términos y condiciones del empleo—especialmente en cuanto se refiere al salario, jornada de trabajo y garantía de compensación mínima semanal—a los fines de intentar calificar como un contrato *tipo Belo*. *Peña* v. *Eastern Sugar Associates*, 75 D.P.R. 304 (1953).

[4] La demandada-recurrente trata, en forma tímida, de impugnar esta determinación de hecho, y al efecto en su alegato afirma que a la terminación de la zafra "no existía obligación alguna de la Eastern Sugar Associates de volverlos a emplear durante la próxima zafra, ni obligación alguna de parte de los querellantes-apelados de volver a trabajar para la Eastern Sugar Associates durante la próxima zafra." (Alegato de la recurrente, pág. 5.) Hemos examinado detenidamente la prueba presentada y estamos satisfechos de que la determinación del tribunal *a quo* está amplia y suficientemente justificada.

días a la semana durante ocho horas diarias, a base de una compensación semanal, y que la querellada computó y liquidó las horas trabajadas dividiendo el salario semanal entre las cuarenta y ocho horas de labor. Se estipuló además que el reclamante Ramón Cintrón Maldonado prestó servicios hasta 1954 mediante el pago de un salario por hora.

Las partes llegaron a un acuerdo satisfactorio en cuanto a la reclamación por los años 1955, 1956 y 1957, y se dictó la correspondiente sentencia parcial.

Respecto a la reclamación por los años 1948 a 1954, ambos inclusive, la querellada levantó las defensas especiales de prescripción de la acción e improcedencia de la misma por tratarse de labores cubiertas por la exención sobre el pago de tiempo extra establecida por la sección 7(c) de la Ley Federal de Normas Razonables del Trabajo, la cual ha sido adoptada en Puerto Rico mediante el Decreto Mandatorio Núm. 3 de la Junta de Salario Mínimo y el artículo 5 de la Ley Núm. 379 de 15 de mayo de 1948.

El tribunal recurrido desestimó la defensa de prescripción y, aplicando lo resuelto en *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R. 93 (1956) y *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R. 688 (1956), condenó a la querellada a satisfacer, a tipo sencillo, a los cinco querellantes que trabajaban a base de un salario semanal, las horas trabajadas en exceso de cuarenta horas a la semana. En cuanto al obrero Ramón Cintrón Maldonado, declaró sin lugar la querella por haber éste prestado sus servicios a base de un salario por hora. Contra la sentencia dictada en 8 de agosto de 1958 se interpuso recurso de apelación.([5])

---

([5]) Aun cuando en *Andino et al.* v. *Fajardo Sugar Co.*, ante, pág. 85 (1961), resolvimos que a partir de la vigencia de la Ley Núm. 115 de 26 de junio de 1958 era el de revisión el recurso apropiado para traer ante nuestra consideración reclamaciones de salarios originados en el Tribunal Superior, y tramitados bajo las disposiciones de la Ley Núm. 10 de 1917, y habiéndose radicado el escrito de apelación dentro del término de cinco días (véase, escolio 12 de dicha opinión), declaramos sin lugar una moción para desestimar el recurso.

*Muñoz* v. *Corte*, 63 D.P.R. 236 (1944) es el punto de partida indispensable para llegar a la solución de la cuestión que consideramos. Tratábase allí de un obrero que prestó servicios como celador y encargado de las fincas y del ganado del patrono, mediante el pago de una compensación semanal, desde el 20 de junio de 1936 hasta el 18 de noviembre de 1940. Rechazamos expresamente la interpretación de que el período prescriptivo comenzaba a deducirse desde la fecha en que el obrero recibía el pago semanal de su salario, y sostuvimos que el término se contaba desde la fecha en que el obrero dejó de prestar los servicios que "venía prestando *ininterrumpidamente* al patrono" (pág. 244), o sea, desde que *cesó* en el empleo. En *Avellanet* v. *Porto Rican Express Co.*, 64 D.P.R. 693, 698–700 (1945) sostuvimos que el término se computaba a partir de la fecha desde que dejara de prestarse los servicios, y que para ello, en caso de que el obrero continuara trabajando para el mismo patrono, debe haber un cambio efectivo en el trabajo realizado por el obrero, o sea, que los servicios prestados fueran de diferente naturaleza. Y en *Jiménez* v. *Corte*, 65 D.P.R. 37, 41–42 (1945) dijimos que cuando el obrero (empleado de una vaquería) abandona el trabajo por meses o años en una industria que funciona todo el año, y *no ofrece una explicación para ello*, cesa en ese momento de rendirle servicios al patrono.(⁶) Excluimos expresamente como sucesos que significaban el dejar de prestar servicios la ausencia del obrero motivada por una breve enfermedad, rotura de la maquinaria o *escasez temporal de trabajo*.

José Chabrán trabajó como dependiente para una empresa desde 1920. Trabajaba solamente cuando se necesitaba o cuando la compañía se lo notificaba. No trabajó todos los días de la semana, pero *siempre que había trabajo*, era notificado de ello y trabajaba. A base de esta situación de

---

(⁶) En el mismo sentido se pronuncia *Valiente & Cía.* v. *Corte*, 68 D.P.R. 529 (1948).

hechos, dijimos que "Chabrán trabajó para la demandada *continuamente*, no intermitentemente, desde el 1920 al 1942", *Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269, 279 (1948), y añadimos que "el demandante trabajó regularmente durante años para la compañía. Ocasionalmente dejaba de trabajar un día, solo por 'escasez temporal de trabajo'. Por tanto. Tales interrupciones no dieron comienzo . . . al período prescriptivo." En *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R. 688, 702 (1956) indicamos que una interrupción en el trabajo en lo que se reorganizaba el servicio donde trabajaba el querellante, no constituía el punto de partida para el cómputo del período prescriptivo.

Según hemos indicado anteriormente, los aquí querellantes prestaron sus servicios durante el período cubierto por la querella (1948 a 1957), y aun desde antes de dicha fecha, *a) realizando el mismo trabajo, b)* durante todo el tiempo en que operó la empresa y *hubo necesidad* de sus servicios, *c)* a *requerimiento de la compañía,* y, *d)* bajo el entendido de que a la terminación de cada zafra los obreros trabajarían para con la querellada durante la próxima zafra, y ésta les conservaría la oportunidad de empleo. Bajo tales circunstancias no podemos sostener que a la expiración de cada zafra se iniciaba un período prescriptivo. El elemento de prestación continua e ininterrumpida de los servicios por el obrero para el patrono está presente en este caso hasta donde lo permite la forma peculiar de trabajo en la industria.[7] La cesantía en el empleo no se debe a una causa que pueda imputarse al obrero. Según hemos expuesto anteriormente al reseñar brevemente nuestras decisiones en situaciones de empleo en industrias que funcionan durante todo el año, hemos pres-

---

[7] Si bien no son estrictamente aplicables, por envolver la interpretación de un estatuto a los fines de contratación colectiva, véanse por vía de ilustración, *Courbourne* v. *Jewett*, 59 N.L.R.B. 176 (1944); *McGee* v. *Durn Co., Inc.*, 59 N.L.R.B. 1508 (1945); *Alaska Salmon Industry, Inc.*, 33 N.L.R.B. 727 (1941); *Sierra Madre-Lamanda Citrus Assn*, 23 N.L.R.B. 143 (1940); *Marlin-Rockwell Corp.*, 19 N.L.R.B. 648 (1940).

tado particular atención a que el cese en la prestación de servicios se haya debido a un acto voluntario del obrero y que no tenga una explicación o justificación razonable. No vemos ningún buen fundamento para no aplicar este mismo criterio a actividades estacionales.

Arguye la querellada recurrente que como los querellantes se dedicaban a otras actividades durante el tiempo muerto y tenían otros patronos, procede sostener que efectivamente cesaron de prestarle servicios a la terminación de cada período de zafra. Para demostrar la debilidad de esta posición, basta decir que, siguiendo esta línea de razonamiento, si el empleado no hubiese trabajado durante el tiempo muerto, no se hubiese operado un cese en la prestación de servicios. Este no es un resultado lógico y razonable. Lo importante es que, no obstante dedicarse a otras actividades mientras la empresa permanecía sin operar, los querellantes dejaban estos trabajos tan pronto sus servicios eran requeridos por la querellada, y había trabajo disponible. Igualmente es un factor importante a considerar la naturaleza de la labor desempeñada, y que al regresar al trabajo los reclamantes ocupaban puestos que venían ocupando desde hace varios años. En efecto puede decirse que constituían la cuadrilla de obreros (*labor crew*) de la fase industrial.

■ En cuanto al obrero Gervasio Rosario que trabajó durante el tiempo muerto en otros empleos con la misma querellada, este hecho del cambio de la naturaleza de los servicios no le afecta, por no ser procedente dentro de este caso la defensa de prescripción por novación de contrato. *Agostini et al.* v. *Tribunal Superior*, supra.

Resolvemos, por tanto, que no cometió error el tribunal recurrido al declarar sin lugar la defensa de prescripción de la acción.

■■ A los fines de resolver sobre la segunda defensa especial levantada por la querellada-recurrente, y atendida

la naturaleza de las funciones que desempeñaban los obreros reclamantes, es preciso establecer que se trata de empleados exentos del pago de compensación adicional (*overtime*) por la sección 7(c) de la Ley de Normas Razonables del Trabajo (29 U.S.C. sec. 207(c) por estar comprendidos en el proceso de elaboración de azúcar. *Maneja* v. *Waialua Agricultural Co.*, 349 U.S. 254 (1955), 216 F.2d 466 (C.A. 9, 1954)), 97 F. Supp. 198; *McComb* v. *Del Valle*, 80 F. Supp. 945 (D.C. P.R., 1948); cf. *Vives* v. *Serrallés*, 145 F.2d 552 (C.A. 1, 1944); *Bowie* v. *González*, 117 F.2d 11 (C.A. 1, 1941); *Calaf* v. *González*, 127 F.2d 934 (C.A. 1, 1942); *McComb* v. *Super-A Fertilizer Works, Inc.*, 165 F.2d 824 (C.A. 1, 1948). No obstante, siendo nuestras leyes locales sobre el contrato de trabajo más beneficiosas que el estatuto federal, y de conformidad con la sección 18 de la Ley de Normas Razonables del Trabajo, debemos aplicar nuestra propia legislación.[8] *Laborde* v. *Eastern Sugar Associates*, 81 D.P.R. 478 (1959); *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R. 93, 103–114 (1956).

■ La querella en este caso cubre el período de tiempo comprendido entre las zafras de 1948 y 1954. En cuanto a la zafra de 1948 la prueba estableció que cuatro de los querellantes comenzaron a trabajar en la Central Santa Juana en 13 de febrero de 1948 y terminaron el día 30 de junio del mismo año; y el otro reclamante que trabajó en la Central Juncos comenzó sus labores en 7 de febrero de 1948 y terminó en junio 19 de dicho año. En forma clara y precisa se establece en el mencionado caso de *Laborde* la extensión de la semana regular de trabajo para la industria azucarera durante el período de zafra (a las págs. 484–485):

---

[5] Para los fines del presente caso se refiere a la Ley Núm. 289 de 9 de abril de 1946 (Leyes, pág. 683, 29 L.P.R.A. secs. 295–299), los apartados B-2(a) y B-2(b) del Decreto Mandatorio Núm. 3 de la Junta de Salario Mínimo, en vigor desde el 29 de abril de 1943, y el artículo 5 de la Ley Núm. 379 de 15 de mayo de 1948 (Leyes, pág. 1255, 29 L.P.R.A. sec. 274).

"Si la querella se refiere al período comprendido desde el 9 de abril de 1946, fecha en que entró en vigor la Ley núm. 289 fijando un día de descanso por cada seis días de trabajo, hasta el 15 de mayo de 1948, fecha en que entró en vigor la Ley núm. 379 para establecer la jornada de trabajo en Puerto Rico, la semana regular de trabajo tiene un límite de cuarenta y ocho horas durante el tiempo de zafra y de cuarenta horas durante el tiempo muerto.

"Si la querella se refiere al período comprendido desde el 15 de mayo de 1948, fecha en que entró en vigor la Ley núm. 379 para establecer la jornada de trabajo en Puerto Rico, hasta el presente, en cuanto al 'tiempo de zafra' se refiere, más que una semana regular de trabajo de cuarenta horas, lo que en realidad existe es un nuevo divisor a base de cuarenta horas para el cómputo de la compensación por horas en exceso de dichas cuarenta horas, como más adelante se dirá. En cuanto al 'tiempo muerto', la semana regular de trabajo es de cuarenta horas.'

Aplicando esta norma a los hechos del presente caso, erró el tribunal recurrido al conceder compensación a los querellantes por las ocho horas en exceso de cuarenta horas a la semana que estos trabajaron durante cualquier período anterior al día 15 de mayo de 1948.[9] *Procede, por tanto, que devolvamos el caso al tribunal de instancia, para que dicte una nueva sentencia de conformidad con los términos de esta opinión.*

El Juez Asociado Sr. Hernández Matos disintió.

---

[9] La jornada de trabajo en la fase industrial de la industria azucarera hasta el día 15 de mayo de 1948 era de cuarenta y ocho horas. La base para determinar el tipo sencillo por hora se obtiene dividiendo el salario semanal por cuarenta y ocho horas, pero en este caso el tipo sencillo por hora no será menor que el tipo mínimo establecido por la escala de salarios del apartado B-1 del decreto. *Laborde* v. *Eastern Sugar Associates*, supra (a la pág. 488).