JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* COOPERATIVA AZUCARERA CENTRAL JUNCOS, demandada.

*Número:* O-69-130 *Resuelto:* 30 de enero de 1970

*José F. Rodríguez Rivera, Procurador General Interino, Celia Canales de González, Marta Ramírez de Vera y José E. Rodríguez Rosaly,* abogados de la peticionaria; *Fiddler, González & Rodríguez, Eduardo Negrón Rodríguez y Pedro Pumarada,* abogados de la demandada.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En 24 de abril de 1968, Juan Guzmán Rosado presentó un cargo contra la Cooperativa Azucarera Central Juncos, en adelante "la Cooperativa", imputándole haber violado el convenio colectivo vigente concertado con la Asociación de Azucareros Profesionales, Art. 8(1)(f) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69(1)(f), al despedirle injustificadamente de su empleo como azucarero de la Central Juncos. Se autorizó la querella correspondiente contra la mencionada cooperativa y la Asociación de Productores de Azúcar de Puerto Rico. Luego del trámite de rigor, la Junta adoptó las conclusiones de hecho y de derecho del oficial examinador, emitió decisión en 7 de mayo de 1969 y ordenó a la Cooperativa a:

"1. Cesar y desistir de:

En manera alguna violar los términos del Convenio Colectivo vigente con la Asociación de Azucareros Profesionales (de oficio) de Puerto Rico, que es de aplicación a la situación de hechos que dio margen al caso del epígrafe.

2. Tomar la siguiente acción afirmativa:

a) Ofrecer a Juan Guzmán Rosado la posición de azucarero que ocupaba en la Central Juncos o una substancialmente equivalente y reembolsarle los ingresos dejados de percibir por éste por razón de las actuaciones de la querellada en su contra.

b) Fijar . . . copias de [un] Aviso . . . ."

Ante la negativa de la querellada a cumplir la orden dictada, la Junta recurrió ante este Tribunal para que la pusiéramos en vigor.(¹) En su escrito de mostración de causas la Cooperativa aduce básicamente que (a) se incidió al determinar que la Cooperativa era un patrono sucesor

---

(¹) Para la fecha en que se emitió la decisión y orden, ya desde el 25 de febrero de 1969 la Cooperativa había ofrecido empleo al querellante en la posición de segundo azucarero, que era la que éste ocupaba al cesar en sus funciones. No se justificaba, por tanto, la disposición de la orden sobre la reposición del querellante.

La querella contra la Asociación de Productores de Azúcar no prosperó porque dicha entidad había meramente actuado en representación de la Cooperativa en la negociación y firma de los convenios.

de C. Brewer Puerto Rico Co., a la cual nos referiremos como Brewer, sujeto a los convenios colectivos concertados, y (b) presumiendo que los convenios fueren aplicables, bajo los hechos que se estimaron probados, no podía concluirse que la querellada violó el convenio vigente. Para la consideración de estos apuntamientos precisa hacer una relación de los convenios a que se refiere la querella y de los hechos sobre la sustitución de patrono y el llamado despido del querellante Guzmán.

—A—

*Los Convenios*

1) En 29 de abril de 1964, la Asociación de Productores de Azúcar, conocida como A.P.A., en representación de catorce centrales y una refinería, entre las cuales se encontraba la Central Juncos, entonces operada por Brewer, y la Asociación de Azucareros Profesionales (de oficio) de Puerto Rico, a nombre de los azucareros que trabajaban en dichas centrales y refinería, negociaron un convenio para regir sus relaciones durante las zafras de los años 1964, 1965 y 1966. El Art. X de dicho convenio proveía en cuanto al aviso en caso de suspensión de zafra o venta o cesión del molino como sigue:

"En el caso de que la Empleante durante la vigencia de este Convenio decidiera *suspender la molienda de cañas durante cualquier zafra subsiguiente a la del año 1964,* o vender, ceder, arrendar o en cualquier otra forma transferir el dominio, posesión o administración del molino o molinos que opera a cualquiera otra persona, firma o entidad, vendrá obligada a notificar por escrito tal suspensión de zafra, venta, cesión, arrendamiento o transferencia a cada uno de los azucareros que prestare servicios en el molino o molinos concernidos dentro de los treinta días siguientes a la terminación de la última zafra trabajada, *con lo cual las partes así afectadas por tal notificación quedarán relevadas de toda ulterior responsabilidad en cuanto a la continuación de este Convenio.* Si una Central cualquiera fuere

trasladada de sitio en Puerto Rico para ser operada por su mismo actual dueño, los azucareros de dicha Central tendrán preferencia para ser empleados en dicha Central en su nueva ubicación."

2) En 3 de febrero de 1967 las mismas partes acordaron extender hasta el 31 de diciembre de 1967 el convenio anterior en los mismos términos y condiciones bajo los cuales había regido. Expresamente se hizo constar que:

"En este estado aclara la empleante que la Central Juncos de C. Brewer Puerto Rico Company, *no operará después de la zafra de 1967.*"

3) En 5 de enero de 1968, la A.P.A., en representación entre otras centrales de la Cooperativa Azucarera Central Juncos, y la Asociación de Azucareros, concertaron un nuevo convenio colectivo para regir sus relaciones durante los años 1968, 1969 y 1970. El Art. VIII(H) de este convenio, de idéntica redacción al del convenio anterior, dice:

"H. Los azucareros no se verán obligados a reportarse a la Empleante sino en fecha en que efectivamente vaya a dar comienzo la molienda de cañas y se les llame a desempeñar sus funciones como tales azucareros; pero si la Empleante les llama para observar las pruebas de los aparatos de su departamento, no podrán negarse a ello, y desde esa fecha comenzarán a recibir sus salarios completos . . . salvo fuerza mayor. Asimismo no se negarán cuando la Empleante los llame para trabajar en cualquier otra factoría en Puerto Rico controlada por los mismos dueños, siempre que la Central o refinería en la cual el azucarero esté prestando servicios no haya terminado su zafra, y siempre que se les provean las mismas facilidades de que disfrutan los que trabajan en dicha factoría y que en la misma no exista un estado de huelga de azucareros. . . ."

—B—

### La Sustitución de Patrono

Desde antes del año 1967, Brewer había operado varias centrales en Puerto Rico, entre las cuales estaba la Central

Juncos. En adición a esta actividad industrial tenía grandes extensiones de terrenos destinadas al cultivo de la caña para la producción de azúcar mediante la molienda en sus centrales. Tanto la fase agrícola como la industrial eran dirigidas y controladas desde las oficinas principales de la compañía. A principios de febrero de 1967, Brewer informó al Departamento de Agricultura de Puerto Rico que se disponía a terminar sus operaciones en el país. Para conjurar las crisis que tal cierre representaba en el sector agrícola, especialmente en las poblaciones en donde ubicaban los molinos, se iniciaron una serie de estudios y gestiones encaminadas a determinar la viabilidad de continuar las operaciones. La Autoridad de Tierras de Puerto Rico encomendó a Ing. Julio Rodríguez Chacón, a la sazón Administrador de la Central Cambalache, que realizara un estudio para explorar la posibilidad de que dicha agencia operara las Centrales Fajardo y Juncos. El señor Rodríguez recomendó la creación de una cooperativa de colonos para operar la Central Juncos, celebrándose varias reuniones sobre el particular con miras a determinar la forma más conveniente de adquisición del molino. Una importante reunión tuvo lugar en abril de 1967, a la cual asistieron el Secretario de Agricultura señor Hernández Agosto, el Director Ejecutivo de la Autoridad de Tierras señor Rivera Hernández, el Director Ejecutivo de la Administración de Terrenos señor Mejías Santana, un grupo de colonos de la Central Juncos y el señor Rodríguez Chacón.

En 18 de abril de 1967 se organizó la Cooperativa Azucarera Central Juncos por un grupo de colonos de caña de ese sector "para estar preparados en caso de que el Gobierno les permitiera operar la Central Juncos." La organización fue registrada oficialmente en el Departamento de Estado el día 18 de mayo siguiente.

A la terminación de la zafra en junio de 1967, Brewer remitió a cada uno de los azucareros que trabajaban en sus

molinos, incluyendo a Juan Guzmán Rosado, una comunicación informándoles de la descontinuación de las operaciones industriales de la empresa.

La Asamblea Legislativa de Puerto Rico aprobó en 9 de junio de 1967 la Resolución Conjunta núm. 50, con vigencia en 1 de julio, asignando a la Administración de Terrenos de Puerto Rico la suma de $1,281,000 para la adquisición de las Centrales Fajardo y Juncos.

En julio de 1967 la Cooperativa designó al señor Rodríguez Chacón para el cargo de Administrador de la Central Juncos. En tal capacidad participó en las negociaciones que se llevaban a cabo con miras a tomar en arrendamiento la planta física de la central. Aunque no se había otorgado formalmente el contrato de arrendamiento, en 1 de agosto la Administración de Terrenos autorizó a la Cooperativa a tomar posesión del molino. El contrato se otorgó en 13 de septiembre por un término de diez años contados a partir del 1 de agosto. Se incluyó una disposición concediendo una opción a la Cooperativa para adquirir el molino.

Al tomar posesión en 1 de agosto, el señor Rodríguez encontró que la fábrica, las oficinas, los almacenes y demás dependencias del molino estaban clausuradas. No había empleados trabajando. Se gestionó personal, que en su mayoría fueron los anteriores empleados de Brewer; los empleados nuevos vinieron a sustituir "a los que se retiraron porque eran personas mayores y manifestaron deseos de no trabajar más." Durante el llamado tiempo muerto se realizaron las reparaciones necesarias y se preparó el molino para operar durante la zafra de 1968 que comenzaría a mediados de febrero de 1968.

—C—

*Los Hechos sobre el "Despido"*

La zafra de 1968 en la Central Juncos estaba señalada para comenzar el día 15 de febrero. Antes de esa fecha los

azucareros que habían trabajado para Brewer, con excepción del querellante Guzmán, inquirieron sobre la continuación de las operaciones y la utilización de sus servicios. Guzmán tenía conocimiento de que el comienzo de la zafra en dicha central tenía lugar a mediados del mes de febrero. Estaba advertido desde antes del comienzo de la zafra, que la Cooperativa iba a operar la central. No hizo personalmente ninguna gestión para solicitar empleo hasta el 4 de marzo, más de dos semanas después del inicio de la molienda. Aunque acostumbraba pasar por la central durante el mes de diciembre, ese año no lo hizo explicando que había fallecido un familiar a quien visitaba en Humacao y en cuyo hogar permanecía por dos o tres días.

En 31 de enero la Cooperativa, a través del Superintendente de Fabricación, le dirigió una carta a Guzmán a la Calle Liceo Sur núm. 70 de Mayagüez, que decía: "Le agradeceré me informe a la mayor brevedad posible si usted está disponible y desea seguir trabajando como segundo azucarero con esta Empresa, Cooperativa Azucarera Central Juncos." Esta dirección era la que aparecía en una libreta de direcciones que había dejado el anterior administrador. La carta fue devuelta por las autoridades postales. Ante esta situación, el Superintendente de Fabricación solicitó de los compañeros azucareros de Guzmán que trataran de localizarlo. Éstos hicieron gestiones a través de la Policía Estatal, pero del Cuartel de Mayagüez informaron que habían sido infructuosas. Se le preguntó al presidente de la unión por la dirección de Guzmán y contestó que la ignoraba. Estando próximo el comienzo de la zafra, la Cooperativa "pactó con el azucarero Manuel Román que, si comenzada la zafra el Sr. Juan Guzmán Rosado no se hubiere presentado, él ocuparía dicha posición." No fue hasta el 22 de febrero que se empleó a Román (que hasta entonces había trabajado en la Central Río Llano). Durante la semana anterior los otros dos azucareros habían trabajado horas extras.

En ocasiones anteriores se avisó a Guzmán por Brewer del comienzo de la zafra mediante cartas y telegramas dirigidas a Liceo Sur núm. 73 que es la casa que queda frente a la de Liceo Sur núm. 70. El año anterior, en febrero de 1967, el administrador anterior de Brewer le había dirigido un telegrama a Guzmán a Liceo Sur núm. 70 para que se "reportara" al trabajo. Guzmán recibió el telegrama y cumplió con lo que se le requería.

En 4 de marzo Guzmán cursó un telegrama al administrador inquiriendo si "yo tengo trabajo o no", que fue contestado cuatro días después informándole de las gestiones realizadas para localizarlo y de la sustitución efectuada, previa notificación a la Asociación de Azucareros.(²)

1. En *Beaunit of Puerto Rico* v. *J.R.T.*, 93 D.P.R. 509 (1966), expresamos que el mero hecho de la sustitución de un patrono por otro, o de un representante de los obreros por otro—situación que específicamente se consideraba—no tenía el efecto de rescindir inmediatamente cualquier convenio colectivo que existiera hasta entonces entre las partes, por ser ello contrario a la conveniencia social y a la política pública de que exista paz industrial. Descansamos principalmente en *Wiley & Sons* v. *Livingston*, 376 U.S. 543 (1964); *Wackenhut Corp.* v. *International U., United Plant Guard W.*, 332 F.2d 954 (9th Cir. 1964) y *United Steelworkers of Amer.* v. *Reliance Univ., Inc.*, 335 F.2d 891 (3d Cir. 1964).

█ En términos generales se requiere una similaridad sustancial en la operación y una continuidad en la identidad de la empresa antes y después del cambio para que se estime que el nuevo patrono deberá asumir obligaciones contraídas por el anterior. *Wiley & Sons.* v. *Livingston, supra.*(³)

_____

(²) Conforme al convenio se garantiza a los azucareros, una vez se les emplee, un total de 920 horas de trabajo sencillo a base de 40 horas semanales durante 23 semanas en cada zafra. Véase el contrato que aparece en *Srio. del Trabajo* v. *Fajardo Eastern Sugar*, 97 D.P.R. 226 (1969).

(³) La transacción que produce el cambio en la identidad patronal puede ser bien a través de una fusión corporativa, como en *Wiley*, supra,

*Assumption of Union Contracts by Successors: Court Decisions and Arbitration Awards*, 20 Arb. J. 20 (1965); *Implications of the John Wiley Case for Business·Transfers, Collective Agreements and Arbitration*, 18 S.C.L. Rev. 413 (1966); Fanning, *The Purchaser and the Labor Contract— An Escalating Theory*, 1967 Labor Relations Yearbook 284; Notas en 44 N.Y.U.L. Rev. 220 (1969); 68 Colum. L. Rev. 1602 (1968); 2 Ga. L. Rev. 574 (1968); 52 Iowa L. Rev. 95 (1966); 60 Nw. U.L. Rev. 224 (1965); 73 Yale L.J. 1459 (1964); 16 Syracuse L. Rev. 164 (1964) y U. Ill. L.F., vol. 1964, pág. 847. A este respecto se ha sostenido que el patrono sucesor, sólo asume aquellas obligaciones del convenio que bajo las circunstancias no sean "irrazonables o inequitativas". *United Steelworkers of Amer.* v. *Reliance Univ., Inc.*, 335 F.2d 891, 895 (3d Cir. 1964).[3a]

 Se ha sugerido la consideración de varios factores a los fines de determinar la existencia de esta similaridad y continuidad, a saber: (1) la existencia de una continuación sustancial de la misma actividad de negocios;[4] (2) la uti-

---

y *McGuire* v. *Humble Oil & Refining Company*, 247 F.Supp. 113 (D.S. N.Y., 1964); o en cualquier otra forma que implique una transferencia de activos, *Wackenhut Corp.* v. *International U., United Plant Guard W.*, 332 F.2d 954 (9th Cir. 1964), *United Steelworkers of Amer.* v. *Reliance Univ., Inc.*, 335 F.2d 891 (3d Cir. 1964); *United States Gypsum Co.* v. *United Steelworkers of Amer.*, 384 F.2d 38 (5th Cir. 1967), *Local Joint Exec. Bd., Hotel & R. Emp. & Bar. Int. U.* v. *Joden, Inc.*, 262 F.Supp. 390 (Mass. 1966). *Cf.*, en caso de cesión de arrendamiento, *Retail Store Emp. U., Local No. 954* v. *Lane's of Findlay, Inc.*, 260 F.Supp. 655 (D.N. Ohio, 1966).

[3a] En *J.R.T.* v. *Club Náutico*, 97 D.P.R. 386 (1969), consideramos la responsabilidad de un patrono sucesor por prácticas ilícitas cometidas por el anterior. Véanse además, *United States Pipe and Foundry Company* v. *N.L.R.B.*, 398 F.2d 544 (5th Cir. 1968); y *Ramada Inns, Inc.*, 68 L.R.R.M. 1209 (1968).

[4] *International Chemical Workers Union* v. *N.L.R.B.*, 395 F.2d 639 (D.C. Cir. 1968); *Makela Welding, Inc.* v. *N.L.R.B.*, 387 F.2d 40, 46 (6th Cir. 1967); *United States Gypsum Co.* v. *United Steelworkers of Amer.*, 384 F.2d 38 (5th Cir. 1967); *Overnite Transportation Company* v. *N.L.R.B.*, 372 F.2d 765, 768 (4th Cir. 1967); *N.L.R.B.* v. *Malcolm Konner Chevrolet, Inc.*, 338 F.2d 972 (3d Cir. 1964); *Retail Clerks Union*

lización de la misma planta para las operaciones; ([5]) (3) el empleo de la misma o sustancialmente la misma fuerza obrera; ([6]) (4) la conservación del mismo personal de supervisión; ([7]) (5) la utilización del mismo equipo y maquinaria y el empleo de los mismos métodos de producción; ([8]) (6) la producción de los mismos productos y la prestación de los mismos servicios; ([9]) (7) la retención del mismo nombre; ([10]) y (8) la operación del negocio durante el período de

*Local No. 1552* v. *Lynn Drug Company*, 299 F.Supp. 1036 (D.E. Ohio 1969); *International B. of P.S. & P.M.W.* v. *Great N.W. Fibre Co.*, 263 F.Supp. 167 (D.E. Wash. 1965); *Local Joint Exec. Bd., Hotel & R. Emp. & Bar. Int. U.* v. *Joden, Inc.*, 262 F.Supp. 390, 396 (Mass. 1966); *Retail Store Emp. U., Local No. 954* v. *Lane's of Findlay, Inc.*, 260 F.Supp. 655 (D.N. Ohio 1966); *Tallakson Ford, Inc.*, 68 L.R.R.M. 1136 (1968); *Thomas Cadillac, Inc.*, 67 L.R.R.M. 1504 (1968); *West Suburban Transit Lines, Inc.*, 62 L.R.R.M. 1101 (1966); *Sinko Mfg. & Tool Co.*, 60 L.R.R.M. 1145 (1965).

([5]) *Overnite Transportation Company* v. *N.L.R.B.*, supra; *Retail Clerks Union Local No. 1552* v. *Lynn Drug Co.*, supra; *International B. of P.S. & P.M.W.* v. *Great N.W. Fibre Co.*, supra; *Randolph Rubber Co.*, 59 L.R.R.M. 1108 (1965).

([6]) *International Chemical Workers Union* v. *N.L.R.B.*, supra; *Overnite Transportation Company* v. *N.L.R.B.*, supra; *N.L.R.B.* v. *John Stepp's Friendly Ford, Inc.*, 338 F.2d 833 (9th Cir. 1964); *Retail Clerks Union Local No. 1552* v. *Lynn Drug Company*, supra; *Local Joint Exec. Bd. Hotel & R. Emp..& Bar. Int. U.* v. *Joden, Inc.*, supra; *Texas Eastman Co.*, 71 L.R.R.M. 1098 (1969); *Joe Robertson & Son, Inc.*, 70 L.R.R.M. 1396 (1969); *Tallakson Ford, Inc.*, supra; *Thomas Cadillac, Inc.*, supra; *Valleydale Packers, Inc.*, 64 L.R.R.M. 1212 (1967); *West Suburban Transit Lines, Inc.*, supra; *Hemisphere Progressive Corp.*, 60 L.R.R.M. 1033 (1965); *Randolph Rubbes Co.*, supra.

([7]) *International Chemical Workers Union* v. *N.L.R.B.*, supra; *Tallakson Ford, Inc.*, supra; *Thomas Cadillac, Inc.*, supra; *Sinko Mfg. & Tool Co.*, supra; *Paramount Paper Products Co.*, 60 L.R.R.M. 1079 (1965); *Skaggs Drug Centers*, 58 L.R.R.M. 1106 (1964); *McLaughlin Industrial Distributors, Inc.*, 49 L.R.R.M. 1545 (1962).

([8]) *N.L.R.B.* v. *Tempest Shirt Manufacturing Company*, 285 F.2d 1 (5th Cir. 1960); *Paramount Paper Products Co.*, supra; *Randolph Rubber Co.*, supra; *New Laxton Coal Co.*, 49 L.R.R.M. 1287 (1961).

([9]) *Overnite Transportation Company* v. *N.L.R.B.*, supra; *N.L.R.B.* v. *Downtown Bakery Corp.*, 330 F.2d 921 (6th Cir. 1964); *Texas Eastman Co.*, supra.

([10]) *Local Joint Exec. Bd., Hotel & R. Emp. & Bar. Int. U.* v. *Joden, Inc.*, supra.

transición. ([11]) La concurrencia de un número suficiente de estos factores es determinante en cuanto a la continuación de obligaciones del convenio. Gordon, *Legal Questions of Successorship*, 3 Ga. L. Rev. 280, 284 (1969); Goldberg, *The Labor Law Obligations of a Successor Employer*, 63 Nw. L. Rev. 735 (1969); Platt, *The N.L.R.B. and the Arbitrator in Sale and Merger Situations*, N.Y.U. 19th Conf. on Labor 375 (1967). Nota, *The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley & Sons, Inc. v. Livingston*, 82 Harv. L. Rev. 418, 428–432 (1968). Conviene apuntar que las interpretaciones de la Junta y los tribunales se han producido en casos que envuelven la negativa a negociar, Secs. 8(a)5 y 8(b)3 de la Ley de Relaciones del Trabajo federal, 29 U.S.C. 158(a)5 y 29 U.S.C. 158(b) (3), y que precisamente la cuestión relativa a la asunción de otras obligaciones derivadas del convenio es una de las áreas crepusculares en la cual la formulación de normas está en proceso continuo. No obstante, no hay duda de que predomina el criterio sugerido en *Wiley*, supra, de la necesidad de establecer un equilibrio entre el derecho del empresario a "organizar independientemente su actividad económica" y la necesidad de reconocer "alguna protección a los empleados por el cambio súbito en la relación obrero-patronal." ([12])

En el presente caso previamente precisa aclarar que, aunque tenue, existe una relación derivada del convenio colectivo concertado por Brewer, que requiere la determinación de si la Cooperativa debe considerarse como un patrono sucesor. El oficial examinador se refiere a la misma como la obligación del nuevo patrono de "respetar el status de los azucareros de la Central Juncos al momento en que su

---

([11]) *Retail Clerks Union Local No. 1552* v. *Lynn Drug Company*, supra; *Ellary Lace Corp.*, 72 L.R.R.M. 1063 (1969).

([12]) Tres importantes áreas en que un cambio de patrono puede afectar a los empleados son las relativas a los beneficios del empleo acumulados, la seguridad en el empleo y los derechos de prioridad (*seniority rights*).

patrono original desapareció como tal." Este status de permanencia se reconoce expresamente en el convenio vigente en su Art. VII ". . . considerando dicha Empleante que *el status adquirido* por dichos azucareros debe conservarse permanentemente para beneficio de las partes . . .", que es idéntico en redacción a su correspondiente en el convenio anterior. ([13])

De los hechos expuestos anteriormente se deduce la presencia de suficientes factores que permiten considerar a la Cooperativa como un patrono sucesor. La actividad de negocios es sustancialmente igual, la producción de azúcar. El hecho de que Brewer se dedicase a actividades agrícolas no es decisivo, pues el convenio que consideramos se refiere exclusivamente a una fase de la elaboración industrial de azúcar. De todas formas, lo apropiado es considerar la unidad de trabajo de que se trata, y en cuanto a ésta, es exactamente igual: la Central Juncos se dedicaba bajo Brewer y se dedica ahora por la Cooperativa a la elaboración de azúcar. La utilización de la misma planta física para las operaciones es innegable, así como la del mismo equipo y maquinaria. Se ha empleado sustancialmente la misma fuerza obrera, y como en forma reveladora afirma el administrador los nuevos empleados sustituyeron "a los que se retiraron porque eran personas mayores y manifestaron deseo de no trabajar más." Igualmente, para todos los fines prácticos, el negocio continuó operándose durante el período de transición, pues sólo estuvo clausurado durante el mes de julio, y ya desde agosto la Cooperativa, que se había organizado desde abril para operar

---

([13]) Debe observarse que se solicita se ponga en vigor la orden de cesar y desistir de violar los términos del convenio *vigente* con la Asociación de Azucareros Profesionales, "que es de aplicación a la situación de hechos que dio margen al caso." Como la Cooperativa fue parte contratante en el convenio *vigente*, tal parecería que no se presenta situación de patrono sucesor. Sin embargo, el derecho de permanencia tiene sus raíces en el convenio anterior, y la alegada violación del convenio consistente en el "despido" de un azucarero arranca del quebrantamiento de ese derecho de permanencia.

el negocio cuando cesara Brewer, se había hecho cargo y comenzó a realizar las operaciones de mantenimiento, conservación y reparaciones que son las que se llevan a cabo durante el llamado tiempo muerto. Además a estos efectos no debe olvidarse que se trata de una industria estacional. *Cf. Rodríguez* v. *Eastern Sugar*, 82 D.P.R. 580 (1961).

La querellada arguye que el oficial examinador incidió en su interpretación al efecto de que el Art. X del convenio que hemos transcrito precedentemente no era aplicable a la situación que discutimos por no haber ocurrido la suspensión de la molienda *durante* la zafra, aun cuando ya ésta había finalizado. Convenimos que el error fue cometido, obedeciendo ello a la consideración que el examinador dio a la frase "suspender la molienda de cañas durante cualquier zafra", cuando ha debido tomarse en cuenta la frase completa "suspender la molienda de cañas durante cualquier zafra *subsiguiente a la del año 1964.*" Sin embargo, ello no es decisivo para sostener que expiró el convenio y las obligaciones que del mismo dimanan, pues el efecto de la notificación provista en dicho artículo se extiende únicamente a "las partes así afectadas por tal notificación [que] quedarán relevadas de toda ulterior responsabilidad en cuanto a la continuación de este Convenio." En forma alguna se dispensa de las obligaciones que podrían corresponder a un patrono sucesor. Pero aun presumiendo que el convenio hubiese expirado a la fecha en que la Cooperativa se hizo cargo de la Central Juncos, esto por sí solo no sería decisivo cuando se demuestra que no ha habido cambios importantes en el personal, los métodos y el equipo y maquinaria empleados, según resuelto en *Overnite Transportation Company* v. *N.L.R.B.*, 372 F.2d 765 (4th Cir. 1967), *cert.* den. 389 U.S. 838 (1967). Véase, *International B. of P.S. & P.M.W.* v. *Great N.W. Fibre Co.*, 263 F.Supp. 167 (D.E. Wash. 1965).

Tampoco tiene la importancia que se pretende el hecho de que Brewer no efectuó una transferencia directa a la Coope-

rativa, sino a la Administración de Terrenos, ya que lo pertinente es la continuidad en la operación de la empresa, y no sutilezas de título.

*Ellary Lace Corp.*, 72 L.R.R.M. 1063 (1969), en que descansa la querellada, más bien sostiene la conclusión a que hemos llegado, pues es claramente distinguible en sus hechos por la notable ausencia de la concurrencia de los factores que se han sugerido para determinar la continuidad e identidad necesarias de un patrono sucesor. Tratábase de un nuevo patrono que sólo adquirió parte del equipo y arrendó un área considerablemente menor de la planta física; que sólo empleó la tercera parte de los supervisores y 17 empleados de alrededor de 115 que tenía el patrono anterior; y que comenzó sus operaciones siete meses después del cese de operaciones de su antecesor dedicándose a una actividad limitada en el ramo de la industria.

En resumen, resolvemos que la Cooperativa es un patrono sucesor, y como tal, asumió las obligaciones que puedan surgir del convenio colectivo que rigió hasta el 31 de dicembre de 1967 y que tienen relación con los hechos que dieron margen a la formulación del cargo por práctica ilícita.

■ 2. Como hemos anticipado, el "despido" a que se refiere el cargo de práctica ilícita resulta de la omisión de la Cooperativa de emplear a Juan Guzmán Rosado como azucarero, cargo que había desempeñado por espacio de once años en la administración de Brewer, durante la zafra de 1968. Determinó el oficial examinador que la empresa querellada no había cumplido con la obligación que le imponía el Art. VIII(H) del convenio—"Los azucareros no se verán obligados a reportarse a la Empleante sino en fecha en que efectivamente vaya a dar comienzo la molienda de cañas y *se les llame a desempeñar sus funciones como tales azucareros* . . ."—de notificar a Guzmán sobre la necesidad de sus servicios y la fecha en que le correspondía comenzar a traba-

jar. Se admite expresamente que la Cooperativa realizó esfuerzos infructuosos para localizar a Guzmán, pero se indica que (a) no se utilizó el medio telegráfico para informarle del comienzo de la zafra; y (b) "surge en el ánimo . . . la duda de cómo es posible que, cuando la Cooperativa solicitó la ayuda de los otros azucareros para localizar al querellante, no se enterase de [su] dirección correcta."

Convenimos que la empresa tenía que hacer gestiones para notificar a los azucareros. Sin embargo, no podemos aceptar que bajo los mismos hechos que estimó probados el examinador, pueda sostenerse que la Cooperativa no cumplió adecuadamente con esta obligación. Si algo puede afirmarse es que el récord revela un cumplimiento sustancial y la realización de las gestiones que razonablemente podían exigirse. No cabe duda de que la Cooperativa interesaba los servicios de Guzmán según aparece del texto de la comunicación escrita que se le cursó y que por un error en la dirección a que se le remitió, no fue reclamada y fue devuelta. El error en la dirección tiene una explicación admisible, que tal era la que aparecía en el único medio de que se disponía en las oficinas de la central en una libreta de direcciones que dejó el administrador anterior. La no utilización de la vía telegráfica no justifica concluir que se incumplió el convenio. Es cierto que Guzmán había recibido el año anterior un telegrama a la dirección incorrecta, pero aparte de que fue Brewer la remitente y no la Cooperativa, ello conduce a concluir precisamente que una comunicación postal dirigida a la misma dirección pudo también haberse recibido. A todo esto se añade que al devolverse la carta se realizaron gestiones para localizarlo a través de los compañeros de trabajo y del delegado de la unión, que se demoró la contratación del sustituto por una semana desde el comienzo de la zafra y que a éste sólo se le ofreció el cargo condicionado a que no se presentase Guzmán. Tampoco puede ignorarse que teniendo conocimiento Guzmán del comienzo de la zafra a mediados de

febrero, se demoró hasta dos semanas después para reclamar su posición.

Consideradas todas las circunstancias concluimos que la Cooperativa no incurrió en la infracción del convenio que se le imputó.

*Se declarará sin lugar la petición de la Junta de Relaciones del Trabajo para que se ponga en vigor la orden dictada en 7 de mayo de 1969 en el caso CA-3765.*

El Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Hernández Matos no intervinieron.